**GRAIN TRADERS, INC., Plaintiff,**

v.

**CITIBANK, N.A., Defendant.**

**No. 95 Civ. 9315(DC).**

United States District Court, S.D. New York.

April 14, 1997.

Steiner & Ebeling by Scott J. Steiner, White Plains, for Plaintiff.

J. Kelly Nevling, Jr., Citibank Legal Affairs Office, New York City, for Defendant.

## OPINION

CHIN, District Judge.

Plaintiff Grain Traders, Inc. ("Grain Traders") brings this diversity action under Article 4–A of New York's Uniform Commercial Code (the "U.C.C.") and principles of common law seeking the refund of money it alleges it lost in the process of an electronic funds transfer. The funds transfer—which was to "pass" through several banks—was not completed, allegedly because defendant Citibank, N.A. ("Citibank") froze an account of one of the banks in question. Grain Traders claims that Citibank acted improperly by accepting $310,000 for a funds transfer and then failing to forward the funds in accordance with instructions, and contends that Citibank instead took the funds as a set-off against a debt owed to Citibank by one of the intermediary banks.

On the record before the Court, however, no reasonable factfinder could conclude that Citibank engaged in any conduct that would form the basis for liability under the U.C.C. or the common law. Rather, Citibank did all that it was required to do: it debited one account $310,000, credited another account $310,000, and forwarded payment instructions to the bank whose account it credited. That bank was supposed to carry out the next step in the funds transfer, but it was unable to do so because of apparent financial problems that eventually caused it to cease doing business. Likewise, the final bank in the chain also was suffering from financial problems that forced it to go out of business. Both banks were chosen by Grain Traders, not Citibank, and it was those choices—rather than any wrongdoing by Citibank—that led to the apparent loss of the $310,000.

Grain Traders's principal argument is that Citibank should not have accepted the payment order. Rather, Grain Traders argues that because Citibank knew or should have known that the next bank in the chain was experiencing financial problems, Citibank should have exercised its judgment to reject the payment order. Grain Traders's arguments, however, do not make sense and they are inconsistent with the concept of funds transfers as well as the letter and spirit of Article 4–A.

Funds transfers are high-speed means of moving large sums of money at a low cost. As the Prefatory Note to Article 4–A observes:

There are a number of characteristics of funds transfers covered by Article [4–A] that have influenced the drafting of the statute. The typical funds transfer involves a large sum of money. Multimillion dollar transactions are commonplace. The originator of the transfer and the beneficiary are typically sophisticated business or financial organizations. High speed is another predominant characteristic. Most funds transfers are completed on the same day, even in complex transactions in which there are several intermediary banks in the transmission chain. A funds transfer is a highly efficient substitute for payments made by the delivery of paper instruments. Another characteristic is extremely low cost. A transfer that involves many millions of dollars can be made for a price of a few dollars. Price does not normally vary very much or at all with the amount of the transfer. This system of pricing may not be feasible if the bank is exposed to very large liabilities in connection with the transaction. . . .

U.C.C. Art. 4–A, Prefatory Note, p. 38 (McKinney Supp.1997).[1] Because of these characteristics—high speed and low cost—

---

1. References to "Article 4–A" and " § 4–A——— " are to Article 4–A of the U.C.C. and sections thereof, as they appear in McKinney's Consolidated Laws of New York Annotated, N.Y. U.C.C. Art. 4–A (McKinney 1991 & Supp.1997).

one could not expect an intermediary bank in the funds transfer to engage in due diligence to verify the creditworthiness of subsequent banks in the chain, particularly when those banks were designated by the originator itself. Indeed, in such circumstances, the risk of loss must be borne by the originator, for it was the originator's choice of an intermediary bank that led to the loss.

Grain Traders's motion for summary judgment on its claims under Article 4–A of the U.C.C. is denied and Citibank's cross-motion for summary judgment dismissing Grain Traders's claims is granted. The complaint is dismissed.

## BACKGROUND

### A. *The Facts*

On December 22, 1994, Grain Traders initiated a funds transfer (the "Funds Transfer") to effectuate the payment of $310,000 to Claudio Goidanich Kraemer ("Kraemer"). (Pl. Rule 3(g) Statement ¶ 3). The Funds Transfer was designed to move money from Grain Traders to Kraemer in one day. The payment order issued by Grain Traders to its bank, Banco de Credito Nacional ("BCN"), stated as follows:

WE HEREBY AUTHORIZE YOU DEBIT OUR ACCOUNT NR 509364 FOR THE AMOUNT OF US$ 310,000.00 AND TRANSFER TO:

BANQUE DU CREDIT ET INVESTISSEMENT LTD ACCOUNT 36013997 AT CITIBANK NEW YORK IN FAVOUR OF BANCO EXTRADER S.A. ACCOUNT NR 30114—BENEFICIARY CLAUDIO GOIDANICH KRAEMER— UNDER FAX ADVISE TO BANCO EXTRADER NR 00541–312 0057/318–0124 AT. DISTEFANO/M. FLIGUEIRA.

(Pargana Aff. ¶ 3 & Ex. C). Thus, the funds transfer was to proceed as follows: (1) Grain Traders's account at BCN was to be debited $310,000; (2) the $310,000 was then to be "transferred" to Banque Du Credit Et Investissement Ltd.'s ("BCI") at Citibank by way of a debit to BCN's Citibank account and a corresponding credit in that amount to BCI's Citibank account; (3) the $310,000 was in turn to be "transferred" from BCI to Banco Extrader, S.A. ("Extrader") by way of an unspecified transaction between BCI and Extrader;[2] and (4) the $310,000 was finally to be transferred to Kraemer by way of a credit to his account at Extrader.

After the payment order was issued by Grain Traders to BCN, the Funds Transfer initially proceeded as expected. BCN's account at Citibank was debited $310,000 and BCI's account at Citibank was credited $310,000. At the same time, BCN sent instructions to Citibank, directing Citibank to instruct BCI to instruct Extrader to credit $310,000 to Kraemer. (Patrickakos Aff. ¶ 6 & Ex. 1).[3] Citibank in turn sent instructions to BCI on the same day, notifying BCI that Citibank had credited its account with $310,000 and instructing BCI to instruct Extrader to credit this amount to Kraemer. (Patrickakos Aff. ¶ 7 & Ex. 2).

Either just before or just after BCI's account at Citibank was credited with the $310,000, however, the BCI account was placed by Citibank on "hold for funds" status. (Pl. Rule 3(g) Statement ¶ 19). The "hold for funds" status, which was put into place because BCI's account with Citibank was overdrawn by more than $12 million, prevented BCI from making any further withdrawals from the account. (*Id.* ¶¶ 19, 22).

Kraemer apparently never received a credit to his Extrader account for the $310,000.

---

2. The record is unclear whether BCI had an account at Extrader or whether Extrader had an account at BCI (or both). The result would be essentially the same under either scenario. If Extrader had an account at BCI, BCI would then have credited Extrader $310,000, which Extrader would then have passed on to Kraemer. If BCI had an account at Extrader, Extrader could then have debited BCI's account $310,000 and then given Kraemer a corresponding credit for $310,000.

3. Because the instructions in Exhibits 1 and 2 to the Patrickakos Affidavit are in a code, they are difficult to decipher. The instructions are explained, however, in the Patrickakos Affidavit, and plaintiff has not submitted any proof to contradict those explanations. Hence, I have accepted the explanations.

Kraemer's affidavit, submitted by Grain Traders, states that on December 28, 1994, just six days after the attempted Funds Transfer, the government of Argentina ordered Extrader to suspend payments and that Extrader became insolvent "[s]ometime later." (Kraemer Aff. ¶ 5). Likewise, BCI, a Bahamian bank, ceased making payments in January 1995; it was closed by supervisory authorities in the Bahamas on July 31, 1995. (Def. Rule 3(g) Statement ¶ 10–12).

## B. *Prior Proceedings*

Grain Traders commenced this action against Citibank in November 1995. The complaint asserts four causes of action: (1) for a refund under U.C.C. § 4–A–402; (2) for a refund as well as reasonable expenses and attorneys' fees under U.C.C. §§ 4–A–209, 4–A–301, and 4–A–305; (3) for breach of the obligation to deal in good faith under U.C.C. § 1–203; and (4) for conversion and money had and received under common law.

These motions followed.

### *DISCUSSION*
#### A. *Standard for Summary Judgment*

Summary judgment may be granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. The non-moving party may not rest upon mere "conclusory allegations or denials," but must set forth " 'concrete particulars' " showing that a trial is needed. *National Union Fire Ins. Co. v. Deloach*, 708 F.Supp. 1371, 1379 (S.D.N.Y.1989) (quoting *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984)). There is no issue for trial unless there exists sufficient evidence in the record to support a jury verdict in favor of the party opposing summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. As the Court held in *Anderson*, "if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). With these standards in mind, I turn to the parties' cross-motions for summary judgment.

### B. *Funds Transfers and Article 4–A*

Funds transfers, also commonly referred to as wire transfers, are a specialized "method of payment in which the person making the payment (the 'originator') directly transmits an instruction to a bank," generally through electronic means, "to make payment to the person receiving payment (the 'beneficiary') or to instruct some other bank to make payment to the beneficiary." § 4–A–104, Official Comment 1. A funds transfer consists of one or more payment orders each instructing the next party in line as to the steps it must follow to carry out the funds transfer. *Id.* Hence, funds are "transferred" through a series of debits and credits to a series of bank accounts. Most often, funds transfers are used as an inexpensive and efficient method of discharging an "underlying payment obligation which arose through earlier commercial dealings between the originator ... and the beneficiary." *Sheerbonnet, Ltd. v. American Express Bank, Ltd.*, 905 F.Supp. 127, 130 (S.D.N.Y.1995).

In the present case, Grain Traders was the originator of a funds transfer intended to pay $310,000 to Kraemer, the beneficiary. Grain Traders requested a series of payment orders that would "transfer" the funds from its bank—BCN—through two "intermediary" banks—Citibank and BCI—and finally into Kraemer's account at his bank—Extrader. Grain Traders asserts that Citibank did not carry out the Funds Transfer as directed and instead improperly used the funds it received as a set-off against debt owed to Citibank by BCI.

## 1. § 4–A–402

■ In its first cause of action, Grain Traders claims that it is entitled to a refund of the $310,000 from Citibank under the "money back guarantee" of § 4–A–402. Section 4–A–402 states:

> (3) . . . With respect to a payment order issued to a receiving bank other than the beneficiary's bank, acceptance of the order by the receiving bank obliges the sender to pay the bank the amount of the sender's order. . . . The obligation of that sender to pay its payment order is excused if the funds transfer is not completed. . . .

> (4) If the sender of a payment order pays the order and was not obliged to pay all or part of the amount paid [because the funds transfer was not completed], the bank receiving payment is obliged to refund payment to the extent the sender was not obliged to pay.

§ 4–A–402(3), (4).

Grain Traders argues that its obligation to pay BCN, and BCN's obligation to pay Citibank, was excused because the Funds Transfer was not completed. Grain Traders therefore asserts that it is entitled to a refund of its payment—pursuant to § 4–A–402—from Citibank. Citibank, however, argues that Grain Traders has sued the wrong party. Citibank claims that § 4–A–402 only allows a party to a funds transfer to obtain a refund from the next party or bank in line. Hence, Grain Traders may only seek a refund—if at all—from BCN. For at least four reasons, I agree with Citibank's interpretation of § 4–A–402.

### i) *Plain Language of § 4–A–402*

■ First, the plain language of § 4–A–402 and other provisions of Article 4–A make it clear that a party to a funds transfer is only entitled to a refund from the specific party to which it made payment. Article 4–A treats a funds transfer as a series of individual transactions, each of which involve two parties dealing directly with each other. This notion is embodied in the very definition of a "funds transfer" as set forth in § 4–A–104(*l* ):

> "Funds transfer" means the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes *any* payment order issued by the originator's bank or an intermediary bank intended to carry out the originator's payment order.

§ 4–A–104(1) (emphasis added). Thus, Article 4–A approaches each funds transfer not as a single payment order, but rather as a series of transactions each of which involves only the parties to the individual payment order.

After establishing this structure, Article 4–A proceeds to define the rights and duties of each bank involved in a funds transfer. First, § 4–A–402(3) states that the bank that sent the payment order must pay the bank that received the payment order when the payment order is accepted. § 4–A–402(3). Thus, the obligation of payment runs only from the sender bank—the bank that sent the payment order—to the bank that received the payment order. *Id.* This subsection further provides that the sending bank's obligation to pay the receiving bank is excused if the funds transfer is not completed. *Id.*

Then, § 4–A–402(4) provides that when a sending bank that is not required to pay—because the funds transfer has not been completed—has already paid, the sending bank is entitled to a "refund" from the receiving bank. § 4–A–402(4). Thus, these sections do not create an obligation to pay or refund a payment with respect to all the parties to a fund transfer, but instead only create an obligation between the sending bank and the receiving bank pursuant to each individual payment order making up the funds transfer. This conclusion is supported by the fact that the singular form of "bank," as opposed to the plural "banks," is used when § 4–A–402 provides that "the bank receiving payment is obliged to refund" the payment. § 4–A–402 (emphasis added). Thus, the plain language of § 4–A–402 makes it clear that a right of refund lies only with respect to parties to a specific payment order and not as to all the parties to a funds transfer.

### ii) *Official Comment to § 4–A–402*

Second, the Official Comment to § 4–A–402 further underscores the intent of Article 4–A's drafters to limit the right of refund under § 4–A–402 to the parties to a specific payment order. The Comment states as follows:

> The money-back guarantee [of § 4–A–402(4) ] is particularly important to Originator if noncompletion of the funds transfer is due to the fault of an intermediary bank rather than Bank A [the Originator's bank]. In that case Bank A must refund payment to Originator, and Bank A has the burden of obtaining refund from the intermediary bank that it paid.

§ 4–A–402, Official Comment 2. Thus, as the Comment explains, the originator is entitled to a refund from the bank to which it issued its payment order, and the originator's bank must then look to the intermediary bank— the bank to which it issued a payment order—to get a refund. Accordingly, the Comment shows that Article 4–A's drafters intended the "money back guarantee" to apply only as between the parties to a payment order and not the parties to the funds transfer as a whole. Applied to the facts of this case, the originator—Grain Traders—would be entitled to a refund under § 4–A–402(4) from its bank, BCN, but not from Citibank.

### iii) *Right of Subrogation*

Third, the subrogation language of § 4–A–402(5) demonstrates that the originator does not, as a general matter, have a right to sue all the parties to a funds transfer. Subsection (5) deals with a situation where an intermediary-receiving bank cannot give a refund to its sending bank because the intermediary bank "suspends payment." [4] In that case, § 4–A–402(5) relieves the sending bank of its obligation to refund the payment it received. Instead, § 4–A–402(5) provides that:

> [t]he first sender in the funds transfer that issued an instruction requiring routing through that intermediary bank [*i.e.,* the one that "suspends payment"] is subrogat-

ed to the right of the bank that paid the intermediary bank to [a] refund.

Hence, the first sender to designate the defaulting bank (the bank that suspended payments) is the one that, by virtue of the subrogation, has the burden of seeking recovery.

What subsection (5) makes clear is that under § 4–A–402(4) no right to a refund otherwise exists between the originator and an intermediary bank. This is evident because there would be no need for the subrogation language of subsection (5) if the originator (as the first sender) already had a right to assert a refund claim directly against all intermediary banks.

The Official Comments to § 4–A–402 confirm that when it is the originator who chooses an intermediary bank that is unable, for financial reasons, to complete its part of the funds transfer, it is the originator, and not any other bank in the funds transfer, who bears the risk of loss. Comment 2 gives the following example:

> Suppose Originator instructs Bank A to pay to Beneficiary's account in Bank B and to use Bank C as an intermediary bank. Bank A executes Originator's order by issuing a payment order to Bank C. Bank A pays Bank C. Banks C fails to execute the order of Bank A and suspends payments. Under subsections [ (3) and (4) ], Originator is not obliged to pay Bank A and is entitled to a refund from Bank A of any payments that it may have made. Bank A is entitled to a refund from Bank C, but Bank C is insolvent. Subsection [ (5) ] deals with this case. *Bank A was required to issue its payment order to Bank C because Bank C was designated as an intermediary bank by Originator.* Section [4–A–302(1)(a) ]. *In this case Originator takes the risk of insolvency of Bank C.* Under subsection [ (5) ], Bank A is entitled to payment from Originator and Originator is subrogated to the right of Bank A under [subsection (4) ] to refund of payment from Bank C.

---

4. "Suspends payments" means that a bank "has been closed by order of the supervisory authorities, that a public officer has been appointed to take it over or that it ceases to make payments in the ordinary course of business." N.Y. U.C.C. § 4–104(1)(m).

§ 4–A–402, Official Comment 2 (emphasis added).

■ Subsection (5) may not be precisely applicable here because it applies to a situation where an intermediary bank suspends payments and it is unclear from the record when BCI suspended payments. Nonetheless, the reasoning of subsection (5) supports the conclusion that in the present case Grain Traders must bear the risk of loss, for it was Grain Traders that chose BCI and Extrader to carry out the funds transfer. Grain Traders thus may not turn to Citibank to recover the loss suffered as a result of Grain Traders's choice of BCI and Extrader to complete the transfer.

### iv) Creation of explicit cause of action by originator against intermediary bank

Finally, Citibank's argument that it owes no refund to Grain Traders finds support from the wording of § 4–A–305. Section 4–A–305(2) provides that a "receiving bank" is liable to the "originator" for interest and expenses under certain circumstances. § 4–A–305(2). Grain Traders points to this section as proof that all intermediary-receiving banks are liable directly to the originator for a refund. However, this section shows just the opposite. Section 4–A–305(2), which has no relationship to the refund provisions of § 4–A–402,[5] demonstrates that when the drafters of Article 4–A wanted to give the originator the right to bring a cause of action against *any* bank in the funds transfer chain, they knew how to make that clear. Thus, had the drafters of Article 4–A intended to allow the originator to seek a refund from any bank in the funds transfer chain, they could have made that clear also.

Accordingly, I hold that Grain Traders may not, as a matter of law, assert a claim against Citibank under § 4–A–402 and hence summary judgment is granted in favor of Citibank on Grain Traders's first claim for relief.[6]

### 2. §§ 4–A–209 and 4–A–301

Grain Traders's second claim for relief is premised on § 4–A–209 and § 4–A–301, which govern "acceptance" and "execution" of a payment order, respectively. Grain Traders alleges that because Citibank intended to use the $310,000 as a set-off to the debt owed to Citibank by BCI, Citibank did not intend to carry out the payment order received from BCN. Grain Traders argues that because of Citibank's misplaced intent, the payment order issued by Citibank to BCI did not constitute the "execution" or "acceptance" of BCN's payment order under § 4–A–209 or § 4–A–301. *See* § 4–A–301 ("A payment order is 'executed' by the receiving bank when it issues a payment order intended to carry out the payment order received by the bank.") (emphasis added). Grain Traders thus concludes that Citibank is liable for its failure to properly execute BCN's payment order. I disagree.

■ As a threshold matter, the record shows unequivocally that Citibank properly executed the payment order that it received. It debited BCN's account $310,000; it credited BCI's account $310,000; and it forwarded instructions to BCI to instruct Extrader to credit Kraemer with $310,000. That was all that it was required to do. As § 4–A–302

---

5. Section 4–A–305 deals with a situation in which a funds transfer is either delayed or not completed because an intermediary bank failed to properly carry out the instructions in the payment order it received—for example, by crediting an incorrect account.

6. On April 12, 1996, approximately five weeks after Citibank filed its cross-motion for summary judgment, Grain Traders executed an assignment with BCN that purports to assign to Grain Traders all of BCN's rights as against Citibank. Based on that assignment, Grain Traders argues that Citibank's arguments concerning § 4–A–402 are moot because "Grain Traders now stands in the shoes of BCN and is entitled to assert all of BCN's claims" against Citibank. (Pl. Reply Mem. at 27). Grain Traders's last-ditch attempt to salvage its first claim for relief is without merit. Even if Grain Traders was able to show that a claim by BCN would not be time-barred, the assignment would be still be invalid here because the allegations in the complaint refer solely to Grain Traders's claims against Citibank and not to those of BCN. Furthermore, Grain Traders may not simply change its theory of the case at this late stage of the proceedings. Thus, I shall not consider the assignment in deciding these motions.

makes clear, an intermediary bank that accepts a payment order "is obliged to issue ... a payment order complying with the sender's order and follow the sender's instructions concerning ... any intermediary bank...." Here, Citibank accepted a payment order from BCN that instructed it to instruct BCI to instruct Extrader to credit $310,000 to Kraemer. Citibank followed these instructions, thereby meeting its obligations, as it relayed the appropriate instructions to the next intermediary bank, BCI.

■ Moreover, even if Grain Traders were able to prove that Citibank failed to execute or accept BCN's payment order, it would nevertheless not be entitled to prevail on its second claim for relief. This is because neither § 4–A–209 nor § 4–A–301 provides a remedy for the failure to carry out a payment order. Rather, these two sections simply define the terms "acceptance" and "execution" as those terms are used in the rest of Article 4–A. If a funds transfer is not completed because one of the parties involved in the funds transfer fails to either "accept" or "execute" a payment order, the only remedy to which the originator is entitled is a refund—pursuant to § 4–A–402—of any payment it made.[7] Thus, Grain Traders's second claim for relief simply leads us back to the same place as its first claim—*i.e.*, a claim for a refund under the "money back guarantee" of § 4–A–402. Accordingly, Grain Traders's second claim for relief is dismissed for the same reasons as its first claim for relief.

## C. *U.C.C. § 1–203*

■ In its third claim for relief, Grain Traders asserts that Citibank's actions violated § 1–203. Section 1–203 imposes an obligation of good faith and fair dealing on a party's performance or enforcement of any contract or duty within the ambit of the Uniform Commercial Code. N.Y.U.C.C. § 1–203. Grain Traders alleges that it is entitled to damages because Citibank violated this section. For two reasons, I disagree.

First, § 1–203 only imposes an obligation of good faith and fair dealing on the perfor-

mance of a "contract or duty." *Id.* In this case, Grain Traders has not alleged that any contract existed between Citibank and itself. Thus, Grain Traders must be relying on a statutory duty as the predicate for its third claim for relief. The only statutory duty that applies in this case, however, is Article 4–A and, for the reasons I have already discussed, Grain Traders has failed to state a claim under that Article. Thus, there is no contract or statutory duty to which Grain Traders can argue that its good faith claim under § 1–203 applies.

■ Second, to the extent that Grain Traders is asserting that a violation of § 1–203 gives rise to an independent cause of action, its assertion is without merit, for § 1–203 does not give rise to an independent cause of action. *See, e.g., Super Glue Corp. v. Avis Rent A Car System, Inc.,* 132 A.D.2d 604, 517 N.Y.S.2d 764, 766 (2d Dep't 1987) ("the Code does not permit recovery of money damages for not acting in good faith where no other basis of recovery is present"). The Official Comment to § 1–203 supports this conclusion:

> This section does not support an independent cause of action for failure to perform or enforce in good faith.... [T]he doctrine of good faith merely directs a court towards interpreting contracts within the commercial context in which they are created, performed, and enforced, and does not create a separate duty of fairness and reasonableness which can be independently breached.

§ 1–203, Official Comment, at Supp. p. 13. Accordingly, Grain Traders's third claim for relief is dismissed.

## D. *Common Law Claims*

■ Grain Traders's fourth claim for relief relies on the common law torts of "conversion" and "money had and received." Grain Traders's tort claims, however, must be dismissed because Grain Traders has failed to present evidence to support either of those

---

7. The only other possible remedies are interest and incidental expenses pursuant to § 4–A–305

for execution of a payment order in breach of § 4–A–302.

claims.[8]

 To prevail on either of its common law claims, Grain Traders must prove that at the time it alleges Citibank improperly kept the $310,000, Grain Traders still had a possessory interest in the funds. *Lind v. Vanguard Offset Printers, Inc.*, 857 F.Supp. 1060, 1066 (S.D.N.Y.1994) (under New York law, *conversion* "requires a showing . . . that the plaintiff had an ownership interest or an 'immediate superior right to possession of property'"); *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank*, 731 F.2d 112, 125 (2d Cir.1984) (to state a claim for *money had and received* under New York Law, the plaintiff must show that "defendant received money *belonging* to plaintiff") (emphasis added). Grain Traders, however, did not have possession of the funds at the time Citibank credited them to BCI's account. This is because a depositor loses title to money deposited in a general account at the moment those funds are deposited. *Peoples Westchester Savings Bank v. FDIC*, 961 F.Supp. 327, 330, 332 (2d Cir.1992); *Swan Brewery Co. Ltd. v. United States Trust Co.*, 832 F.Supp. 714, 718 (S.D.N.Y.1993). Moreover, the cases cited by Grain Traders in support of its fourth claim for relief are inapposite. *See, e.g., Raymond Concrete Pile Co. v. Federation Bank & Trust Co.*, 288 N.Y. 452, 43 N.E.2d 486 (1942) (dealing with a trust account rather than a general deposit account); *Daly v. Atlantic Bank*, 201 A.D.2d 128, 614 N.Y.S.2d 418 (1st Dep't 1994) (dealing with funds held by an agent as fiduciary for third parties); *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 559 N.Y.S.2d 704 (1st Dep't 1990) (dealing with case where bank deposited funds in wrong account and then seized funds).

Citibank did not convert any funds, nor, in fact, did it receive any funds. Rather, it debited one account $310,000 and credited another account $310,000, and it forwarded the appropriate payment instructions. That was all it was required to do. BCI should have carried out those instructions, but it was unwilling or unable to do so.

## CONCLUSION

For the foregoing reasons, Grain Traders's motion for summary judgment is denied and Citibank's cross-motion for summary judgment is granted. Accordingly, the Clerk of the Court shall enter judgment in favor of Citibank dismissing the complaint with prejudice and without costs.

SO ORDERED.

---

8. Citibank also argues Grain Trader's common law claims must be dismissed because that Article 4–A provides the exclusive remedy for claims involving funds transfers. However, because Grain Traders's fourth claim for relief fails on the merits, I need not reach the question of whether its common law claims are precluded by Article 4–A.