[789 NYS2d 95]

The Bank of New York, Petitioner, v Norilsk Nickel, Appellant, and Monter Joint Stock Company, Respondent, et al., Respondent.

First Department, December 21, 2004

### APPEARANCES OF COUNSEL

*Chadbourne & Parke LLP*, New York City (*Kenneth A. Caruso* and *Daniel S. Meyers* of counsel), for appellant.

*John Walshe & Associates*, New York City (*John Walshe* of counsel), for Monter Joint Stock Company, respondent.

### OPINION OF THE COURT

CATTERSON, J.

In 1991, war broke out in Yugoslavia when Slovenia and Croatia declared independence. Although the actions of the breakaway republics were reminiscent of the events of 1914 that ultimately led to the Great War, the reactions of the world's powers were thankfully, substantially different.

The United States and the United Kingdom reacted to the conflict by imposing economic sanctions on Serbia. Prior to the conflict in Yugoslavia, Congress had enacted the International Emergency Economic Powers Act (hereinafter referred to as IEEPA; 50 USC § 1701 *et seq.*), which empowered the President to block the property and interests in property of nationals of countries that are involved in an "unusual and extraordinary threat . . . to the national security, foreign policy, or economy of the United States." (§ 1701 [a].) On May 30, 1992, President George H. W. Bush issued Executive Order No. 12808 (57 Fed Reg 23299), in which he found that "the actions and policies of the Governments of Serbia and Montenegro . . . in their involvement in and support for groups attempting to seize territory in Croatia and Bosnia-Hercegovina by force and violence" constituted the requisite threat. The Executive Order and the

ensuing Office of Foreign Assets Control of the United States Department of the Treasury (hereinafter referred to as OFAC) regulations blocked property and interests in property of Serbian nationals and others in specified circumstances.

The regulations promulgated by OFAC had a relatively narrow objective. The "Federal Republic of Yugoslavia (Serbia & Montenegro) and Bosnian Serb-Controlled Areas of the Republic of Bosnia and Herzegovina Sanctions Regulations" (31 CFR part 585) provided:

> "[N]o property or interest in property of any commercial, industrial, or public utility undertakings or entities organized or located in the Federal Republic of Yugoslavia (Serbia and Montenegro) . . . that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons . . . may be transferred, paid, exported, withdrawn or otherwise dealt in." (31 CFR 585.201 [b].)

Prior to the enactment of that regulation, respondent-appellant Norilsk Nickel (hereinafter referred to as Norilsk) was given a license by the government of the former Soviet Union to construct a furniture factory in the City of Norilsk.[1] V.V.O. Technoexport, acting as the agent of Norilsk, contracted with General Export, LTD., one of Yugoslavia's largest companies, to build the factory.

At that time, the USSR was experiencing a shortage of currency available for foreign exchange. Accordingly, Norilsk was authorized by the Soviet government to pay for the construction project by means of exporting copper-nickel matte (enriched copper-nickel ore) produced by Norilsk at its mining facility. Specifically, a supplement to the contract with General Export, LTD., provided for payment by delivery of matte to a company called Falconbridge Nikkelwerk A/S (hereinafter referred to as Falconbridge) at its plant in Norway. Falconbridge would extract copper, nickel and other metals from the matte and would then purchase those metals, paying their market price, less the cost of extraction, to accounts at Midland Bank and Barclays Bank in London.

---

**1.** The City of Norilsk is in the central northern part of Siberia and has the distinction of being the coldest inhabited place on Earth with an annual average temperature of 12.4 degrees Fahrenheit. Norilsk Nickel is the largest producer of palladium in the world.

The accounts at Midland Bank and Barclays Bank were held in the name of General Export LTD., Genex-Metali Belgrade (hereinafter referred to as Genex) and an affiliate. Norilsk was authorized to give instructions for payment from these accounts, inter alia: (1) to pay Genex for constructing the factory and (2) to pay the invoices of companies that supplied equipment used in constructing the factory. When the various economic sanctions took effect in 1992, the United Kingdom froze the Genex accounts at Midland and Barclays Banks.

Norilsk sought to have the blocked monies transferred to Russia so that Norilsk could pay for supplies and equipment for the furniture factory. Norilsk applied to British authorities for a license to transfer the monies. On October 28, 1993, the Bank of England granted a license to transfer approximately $3.9 million. Approximately $1.4 million was thereupon transferred to Norilsk. The balance—approximately $2.5 million—is at issue in this proceeding.

On November 4, 1993, Genex originated funds transfers by giving payment orders to its bank, Midland Bank, to transfer approximately $2.5 million to Norilsk at Norilsk's account at International Moscow Bank. Midland Bank accepted Genex's payment orders by executing them and sending payment orders to the Bank of New York, as intermediary bank, where Norilsk's bank, International Moscow Bank, maintained a correspondent account for electronic funds transfers in United States currency. Midland Bank's payment orders instructed the Bank of New York to credit the account of International Moscow Bank for the benefit of Norilsk.

On November 5, 1993, Midland Bank sent Genex a "debit advice" informing Genex that Midland Bank had debited Genex's account in the amount of $2,406,227.41, and had instructed the Bank of New York to credit the account of Norilsk at the International Moscow Bank in a series of three separate wire transfers dated November 8, 10 and 24, 1993. It is undisputed that the Bank of New York accepted the transfer orders but pursuant to 31 CFR part 585, the Bank froze the funds transfers in New York, adhering to the maxim "abundans cautela non nocet." The bank maintained the funds in a "call account" in New York.

Eventually, the regulations authorizing the freezing of Yugoslavia-related transfers were rescinded in part. Effective February 25, 2003, pursuant to 31 CFR 585.529, all funds frozen pursuant to the OFAC regulations were released but for certain

exceptions not relevant to this appeal. (*See* 31 CFR 585.529 [a] [1] ["as of February 25, 2003, all transactions that otherwise would be prohibited by this part . . . are authorized"].) That same regulation also authorized any person or government to seek an attachment or other restraint with respect to any property subject to the pending unblocking. (*See* 31 CFR 585.529 [b].)

Norilsk asked the Bank of New York to unblock the funds in question as of February 25, 2003. By that date, however, two creditors of Genex or its affiliates had served process on the Bank of New York with respect to the funds.

On February 12, 2003, respondent LBS Bank-New York (hereinafter referred to as LBS Bank) served a restraining notice in an action entitled *LBS Bank-New York v Impex Overseas Corp. and BSE Genex Co. Ltd.* (Index No. 601131/98, Sup Ct, NY County). LBS Bank had previously obtained a judgment and sought to restrain any assets of a Genex affiliate up to $501,612.64, the amount of that judgment.

On February 24, 2003, respondent-respondent Monter Joint Stock Company (hereinafter referred to as Monter) served an order of attachment obtained in an action entitled *Monter Joint Stock Co. v Udruzena Beogradska Banka et al.* (Index No. 115962/96, Sup Ct, NY County). The defendants in that Monter action included two Genex affiliates. In pertinent part, the order of attachment directed the Sheriff of New York County to levy on "the amount of $6,681,747.57 transferred by/to Norilsk Nickel, Falconbridge, BSE Genex Company, Ltd., or General Export in or about November 1993 through [*sic*] and held by the Bank of New York for the benefit of one or more of·the forementioned [*sic*] companies."

In light of the competing claims to the funds, the Bank of New York refused to complete the funds transfers that had been originated almost a decade ago by Genex for the benefit of Norilsk. The bank had continuously maintained the funds in a "call account" in New York. On April 2, 2003, the Bank of New York commenced the underlying proceeding seeking interpleader relief against Norilsk, LBS Bank and Monter.

Norilsk answered the Bank of New York's petition and asserted cross claims against LBS Bank and Monter. In its cross claims, Norilsk sought vacatur of the restraints on the funds, so that the funds transfers would be completed. Norilsk also sought an award of damages, including attorney's fees, for wrongful attachment.

LBS Bank thereafter vacated its restraining notice and released its claims to the funds. Norilsk in turn dismissed its cross claims as against LBS Bank. Thus, only Norilsk and Monter remained as adverse claimants to the funds.

Norilsk moved for summary judgment on its cross claim seeking to vacate the attachment and for an award of damages, including attorneys' fees, against Monter for wrongful attachment. Monter cross-moved for summary judgment dismissing Norilsk's cross claims. The Bank of New York moved for an order of discharge from liability and for an award of attorneys' fees to be paid from the funds.

Supreme Court denied both the motion and the cross motion for summary judgment. The court granted the Bank of New York's motion for an order of discharge of liability and an award of attorney's fees to be paid equally by Norilsk and Monter. For the reasons that follow, that part of the order denying Norilsk's motion for summary judgment is reversed and the funds are released to Norilsk. The award of attorney's fees to the Bank of New York is modified to the extent that the award is to be paid by Monter alone. Furthermore, the matter is remanded for a calculation of damages to Norilsk incurred by reason of the wrongful attachment of the funds at issue, such damages to be paid by Monter.

## Ownership of the Attached Funds is Determined by the UCC

It is beyond cavil that attachment will only lie against the property of the debtor, and that the right to attach the property "is only the same as the defendant's own interest in it." (*Sidwell & Co., Ltd. v Kamchatimpex*, 166 Misc 2d 639, 644 [Sup Ct, NY County 1995].)

Property rights in the funds under attachment in this case are governed by the UCC. The motion court recognized that if the UCC applied to the transfers at issue, title to the funds passed from Genex in 1993. Such title passed when Midland Bank accepted Genex's payment orders by executing them (i.e., when Midland Bank sent payment orders to the Bank of New York). (*See* UCC 4-A-502 [4] [process can be served only on beneficiary's bank, not on intermediary bank]; 4-A-503 [court cannot restrain intermediary bank from completing funds transfer]; *see also Weston Compagnie De Fin. Et D'Investissement S.A. v La Republica Del Ecuador*, 1993 WL 267282, *4, 1993 US Dist LEXIS 9531, *10 [SD NY, July 14, 1993] [funds transfer that is "in motion" cannot be attached at intermediary bank].) Indeed, Monter conceded below that UCC

4-A-503 "mandates that upon the initiation of a wire transfer[,] a 'stop payment' or other interference to the transfer may not be had."[2] However, Supreme Court held that it could not determine at the motion stage whether the UCC was preempted by federal law.

It is apparent that the OFAC regulations did not preempt the application of the UCC to electronic funds transfers. There is no specific preemption of the UCC in either the Presidential Order or 31 CFR part 585. Therefore, IEEPA and the OFAC regulations could preempt the UCC only if those federal provisions actually conflict with the UCC, either because compliance with both federal law and the UCC is impossible or because the UCC stands as an obstacle to the accomplishment and execution of the full purpose and objectives of federal law. Indeed, the Bank of New York complied with part 585 without violating the UCC when it froze the funds in place. Furthermore, the UCC did not stand as an obstacle to federal law because, while the UCC determined title to the funds at issue, federal law impeded movement of those funds beyond the locus.

The federal law mandated that certain "interests" in property be blocked or frozen without regard to concepts of actual title to property as defined by state law. The applicable regulation, 31 CFR 585.201 (b), provided:

> "[N]o property or interest in property of any commercial, industrial, or public utility undertakings or entities organized or located in the Federal Republic of Yugoslavia (Serbia and Montenegro) . . . that hereafter come within the United States, or that are or hereafter come within the possession or control of United States persons . . . may be transferred, paid, exported, withdrawn or otherwise dealt in."

This regulation authorized OFAC to block "property" or any "interest in" property regardless of who had actual title. When promulgating its regulations, and defining interests in property, OFAC did not apply the UCC and was not limited by concepts of

---

**2.** Inexplicably, and without citation to any authority, Monter urges on appeal that the location of the actual currency is germane and a failure of proof on this issue precludes summary judgment. In an action involving electronic funds transfers, the physical location of any currency (if there even is some physical currency) is completely irrelevant. Even a cursory review of the UCC makes that principle plain. Furthermore, it is undisputed that the Bank of New York was holding the funds in a "call account" in New York throughout the pendency of both the freeze and the subsequent attachment. Thus, Monter's argument to the contrary is wholly unsupported by the record.

title under state law. (*See e.g.*, *D.C. Precision, Inc. v United States Govt.*, 73 F Supp 2d 338, 344-345 [SD NY 1999].) Rather, OFAC "may choose and apply its own definition of property interests, subject to deferential judicial review." (*Consarc Corp. v Iraqi Ministry*, 27 F3d 695, 701 [DC Cir 1994].)

OFAC defined "property" very broadly to include "debts, indebtedness [and] obligations." (31 CFR 585.304.) OFAC defined an "interest" in property equally expansively, to include "an interest of any nature whatsoever, direct or indirect." (31 CFR 585.303.) The terms "interest" and "title" are clearly not synonymous. Thus, OFAC blocked assets based on interests in property and the use to which such property was put, not based on who owned the property in question. (*See e.g. Global Relief Found., Inc. v O'Neill*, 315 F3d 748, 753 [7th Cir 2002], *cert denied sub nom. Global Relief Found., Inc. v Snow,* 540 US 1003 [2003] ["The function of the IEEPA strongly suggests that beneficial rather than legal interests matter. . . . Thus the focus must be on how assets could be controlled and used, not on bare legal ownership."]; *accord Holy Land Found. for Relief & Dev. v Ashcroft*, 333 F3d 156, 162-163 [DC Cir 2003] [same].)

In the instant case, Norilsk correctly asserts that the OFAC regulations focused on Genex's "interest" in property and on how the funds would be used, not on the passage of title to the funds pursuant to the UCC. The OFAC regulations sought to prevent the use or movement of money in any way that would confer a benefit upon any national of Serbia. Here, Genex, a national of Serbia, sought to use the funds by transferring them to discharge a debt that Genex owed to Norilsk. Thus, Genex had an "interest" in the funds, viz.: using the funds to discharge a debt. OFAC had the power to block such an interest by preventing the movement of the funds—and to do so notwithstanding the passage of title pursuant to the UCC.

It is clear that, under the UCC, title to the funds in question passed from Genex to Midland Bank in 1993, but federal law operated to prevent the movement of the funds from 1993 until 2003. When the hostilities in Yugoslavia ended, and the federal government had no further reason to block Genex's use of the funds, federal law unblocked the funds. The UCC then required that the funds be transferred to the rightful owner, Norilsk. Thus, federal and state law did not conflict at all; they simply addressed different issues.

There Is No Issue of Fact that Precludes Summary Judgment

The motion court erred in denying summary judgment when it held that "issues of fact remain as to whether the transfers

were made in compliance with 31 CFR § 585.202 (d)." Section 585.202 (d) does not apply to the facts of this case because that section, as limited by section 585.202 (a), merely prevents transfers of "any property or interest in property blocked pursuant to § 585.201." The funds in question were blocked by the Bank of New York under section 585.201 and no transfer prohibited by section 585.202 (d) ever occurred. Indeed, it was the Bank of New York that commenced the original proceeding to resolve the issues of ownership and attachment following the bank's implementation of section 585.201.

Similarly, the motion court relied on 31 CFR 585.403 (a) in denying summary judgment. Again, Norilsk correctly asserts that section 585.403 (a) is inapplicable in the instant case. Plainly, this section applies only after (1) property has been blocked, (2) a license or an authorization to transfer that property has been obtained and then (3) "a transaction licensed or authorized by or pursuant to this part results in the transfer of property." Thus, in this case, section 585.403 (a) would have applied only after (1) the funds arrived at the Bank of New York and were blocked, (2) Norilsk or Genex obtained from OFAC a license to transfer the funds from the Bank of New York to Norilsk and (3) the Bank of New York then transferred the funds to Norilsk pursuant to such license. No such transfer has occurred and therefore, section 585.403 (a) is irrelevant to the issues in this case.

Finally, the motion court found that outstanding issues with regard to the applicability of Soviet law also precluded a grant of summary judgment. This was error. Section 4511 (b) of the CPLR places the burden on Monter to put adverse parties on notice of any intention to ask the court to rely on Soviet law. Rule 3016 (e) of the CPLR also provides, "Where a . . . defense is based upon the law of a foreign country . . . the substance of the foreign law relied upon shall be stated." Monter, however, never pleaded the substance of Soviet law and appears to have abandoned this issue on appeal. (*See e.g.*, *Dresdner Bank AG. v Edelmann*, 129 Misc 2d 686, 688 [Sup Ct, NY County 1985], *affd* 117 AD2d 1024 [1986] ["(I)f (a) party elects to use the pleadings as the vehicle for giving notice, then he must comply with the formalities of CPLR 3016 (e) and state the substance—as opposed to a mere citation of the law, on the one hand, or a verbatim reproduction of the statute, on the other—of the foreign law."].) Even assuming that a party can cure a pleading that is defective in this respect, Monter never gave the

requisite notice or established the substance of Soviet law at any later stage. Thus, Monter's affirmative defenses failed as a matter of law. (*See e.g. Alas Intl. Ltd. v Ramiz*, 257 AD2d 408, 409-410 [1st Dept 1999].)

Where, as here, the record reveals "a total failure" to prove foreign law, "the parties have consented that the forum law be applied to the controversy." (*Watts v Swiss Bank Corp.*, 27 NY2d 270, 276 [1970]; *accord Lerner v Karageorgis Lines, Inc.*, 66 NY2d 479, 487, 487 n 6 [1985]; *Schedlmayer v Trans Intl. Airlines*, 99 Misc 2d 478, 483 [Civ Ct, NY County 1979]; 9 Weinstein-Korn-Miller, NY Civ Prac ¶ 4511.06, at 45-358.) Thus, given Monter's failure of proof, Supreme Court should have decided the motion and cross motion by applying the New York and federal law cited by the parties.

Attorney's Fees and Damages

The motion court awarded the Bank of New York attorney's fees, payment of which was divided evenly between Norilsk and Monter. This was error. Section 1006 (f) of the CPLR provides in part that "[t]he court shall impose such terms relating to payment of expenses, costs and disbursements as may be just . . . ." Given the holding above, that Monter has no claim to the attached funds, it would be unjust to impose half of the costs claimed by the Bank of New York on Norilsk.

Finally, Norilsk is entitled to damages flowing from the wrongful attachment by Monter. CPLR 6221 authorizes the court, in vacating an attachment, to "direct that . . . damages be awarded." Section 6221 is "*in pari materia* and [is] to be construed consistently" with CPLR 6212 (e). (*Ford Motor Credit Co. v Hickey Ford Sales, Inc.*, 62 NY2d 291, 302 [1984].)

Rule 6212 (e) requires the court to award damages, including attorneys' fees, without a showing of fault, for wrongful attachment. Rule 6212 (e) was added "to make the attaching plaintiff strictly liable for all damages occasioned by a wrongful attachment." (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C6212:8, at 74; *see Ford Motor Credit*, 62 NY2d at 302 [noting that section 6221 allows an award of damages to "any interested party," including a person who was not a party to the action in which the attachment was obtained].) Thus, the matter must be remanded for a calculation of damages incurred by Norilsk due to Monter's wrongful attachment.

Accordingly, the order of the Supreme Court, New York County (Charles E. Ramos, J.), entered May 10, 2004, which, to

the extent appealed from as limited by the brief, denied the motion of respondent-appellant Norilsk Nickel for summary judgment vacating the subject notice of attachment and awarding it damages on its cross claim against respondent-respondent Monter Joint Stock Company, and granted so much of the motion of petitioner stakeholder the Bank of New York as sought payment of its counsel fees pursuant to CPLR 1006 (f) from the disputed funds held by it, should be modified, on the law and the facts, to the extent of granting respondent Norilsk's motion for summary judgment and directing the release of the funds to said respondent; directing that the award of counsel fees to the Bank of New York is to be paid by Monter Joint Stock Company; and remanding the matter for a calculation of damages to Norilsk Nickel to be paid by Monter Joint Stock Company, and otherwise affirmed, without costs.

BUCKLEY, P.J., ELLERIN, LERNER and MARLOW, JJ., concur.

Order, Supreme Court, New York County, entered May 10, 2004, modified, on the law and the facts, to the extent of granting respondent Norilsk's motion for summary judgment and directing the release of the funds to said respondent; directing that the award of counsel fees to the Bank of New York is to be paid by Monter Joint Stock Company; and remanding the matter for a calculation of damages to Norilsk Nickel to be paid by Monter Joint Stock Company, and otherwise affirmed, without costs.