[873 NYS2d 281]

PALESTINE MONETARY AUTHORITY, Respondent, v DAVID STRACH-
MAN, as Administrator of the Estate of YARON UNGAR,
Deceased, et al., Appellants, et al., Defendant.

ESTATE OF YARON UNGAR, Deceased, et al., Appellants, v THE
PALESTINIAN AUTHORITY, Also Known as THE PALESTINIAN
INTERIM SELF-GOVERNMENT AUTHORITY, et al., Respondents.

First Department, February 17, 2009

214

### APPEARANCES OF COUNSEL

*Jaroslawicz & Jaros, LLC*, New York City (*Robert J. Tolchin* of counsel), for appellants.

*Lynch Daskal Emery LLP*, New York City (*James R. Lynch* of counsel), for respondents.

### OPINION OF THE COURT

CATTERSON, J.

This action arises from attempts to enforce a judgment of more than $116,000,000 against the Palestinian Authority and the Palestine Liberation Organization for terrorist activities that resulted in the death of an American citizen and his Israeli wife. A federal judgment was domesticated in New York and the judgment creditors also issued restraining notices pursuant to CPLR 5222, which subsequently led the Bank of New York to freeze millions of dollars in wire-fund transfers involving the two judgment debtors, as well as entities purportedly associated with them. One of the entities, the Palestine Monetary Authority (hereinafter referred to as PMA), initiated this action seeking a declaration that $30,000,000 of the frozen funds transfers where the PMA was either the sender or the designated beneficiary were improperly restrained. This appeal focuses on three main issues: ownership of the frozen funds; whether the funds may be used to satisfy the judgment in part; and significantly for New York's banking industry, whether the restraint on the funds violates New York's banking laws, specifically the provisions of Uniform Commercial Code article 4-A governing creditor process and injunctions on wire-fund transfers.

The following facts are undisputed: On January 27, 2004, the children and heirs of Yaron and Efrat Ungar (hereinafter referred to as the Ungars) secured a judgment in the amount of $116,400,000 against the Palestinian Authority (hereinafter referred to as PA) and the Palestine Liberation Organization (hereinafter referred to as PLO) in connection with the brutal murder of both parents on a street in Israel by members of Hamas, a terrorist organization controlled by the PA and PLO. (*Estates of Ungar ex rel. Strachman v Palestinian Auth.*, 304 F Supp 2d 232 [D RI 2004].)

Acknowledging that the PA and PLO did not intend to honor the judgment, on May 5, 2005, the federal court in Rhode Island

granted the Ungars an injunction against the PA, the PLO "and their officers, agents . . . and any natural or legal persons in privity with them and/or acting on their behalf and/or in active concert and participation with them" enjoining the withdrawal, sale or transfer of any of their assets in the United States.

The Ungars domesticated the federal judgment in New York County and on the same day served a number of financial institutions including the Bank of New York (hereinafter referred to as BNY) with a notice of the federal injunction and information subpoenas with statutory restraining notices. The latter included the following paragraph: "the assets and property in which the judgment-debtors have an interest are held and/or titled under the names Palestine Authority, Palestine Liberation Organisation, . . . Palestine National Authority . . . Palestine Monetary Authority."

Between May 16, 2005 and June 9, 2005, the BNY responded by freezing millions of dollars of transactions by issuing a "Stop Payment. Funds suspended" instruction. The majority of the transactions were wire transfers by the Palestinian National Authority's Ministry of Finance, Gaza to the National Authority's embassies. There is no issue or controversy with respect to these funds. However, $30,000,000 of the frozen funds involved the PMA. Those are the funds at issue here.

As to the PMA itself, the sum of what is undisputed is that the PMA was established by the PA, a nonstate entity which itself was created by the Oslo Accords, a series of agreements between the sovereign state of Israel and the PLO. Article IV of the Oslo Accords gave the PA the right to create a "monetary authority" and in 1997, Yasser Arafat, president of the PA and chairman of the PLO, issued a decree entitled Monetary Authority Law (hereinafter referred to as MAL) creating the PMA.

On June 3, 2005 the PMA commenced the instant action against the Ungars and the BNY, seeking a declaratory judgment disassociating PMA from the PA and PLO. On June 6, 2005, the PMA brought an order to show cause for a preliminary injunction requiring the BNY to release the frozen PMA transactions. In the order to show cause, the annexed affidavit of George Abed, the governor of the PMA, stated that the PMA possesses an "autonomous corporate character financially independent from the [PA] and [PLO]" and deals exclusively with privately owned commercial banks. The PMA claimed its purpose is to facilitate normal banking activity and help maintain financial stability by providing liquidity to those banks

through the PMA's bank, the Palestine International Bank (hereinafter referred to as PIB), which acts as a clearinghouse for those banks whose interbank transactions in U.S. dollars are cleared through the BNY. Abed denied that the PMA holds or manages any funds of the PA or the PLO, and stated that because the PA is not yet a sovereign state, the PMA does not hold any gold reserves or act as PA's fiscal agent.

On June 23, 2005, the Ungars answered the PMA complaint and counterclaimed for a declaratory judgment that the PMA and the PA are indistinguishable, and for a turnover from the PMA of any and all PA assets held. They also cross-claimed against the BNY for turnover of the PMA's assets. The Ungars argued that the PMA is a shield for the PA's financial activities and assets and that the PA is de facto in control of the PMA. The Ungars relied on the MAL to assert that the PMA's initial capital was to come from the PA, its shortfall was to be paid by the PA, and its profits were to be paid to the PA. As to management, the PMA's governor is appointed by the PA chairman as are its board members, their salaries are determined by him, and he has the right to terminate the PMA board members and officers. Additionally, the Ungars showed that the PMA regularly used the PA's letterhead.

On June 30, 2005 the motion court heard arguments on the PMA's order to show cause for a preliminary injunction. The court stated that there were two issues that needed to be determined: whether the PMA is the alter ego or an agent of the PA or the PLO; and even if it is not, whether or not it holds any funds of the PA or the PLO. The hearing was inconclusive. The Ungars requested discovery on whether the private banks, the claimed owners of the restrained funds, had either complained or asserted claims against the PMA, whether the PMA had paid them from other funds, and on the sources of the PMA's reserves of more than $500 million. The court decided that a factual hearing was necessary, which was scheduled and held over four days in the first week of August 2005. The court limited prehearing discovery.

The testimony and evidence adduced at the hearing focused on the ownership of the funds as of a time prior to the PMA's issuance of payment orders, that is before the funds transfers were set in motion. Mr. Abu-Habsa, executive director of the PMA's banking supervision department for the $2^{1/2}$ years prior to the hearing, testified that a summary chart in evidence reflected holdings of various commercial banks and not of the PMA itself.

He testified that the PMA's capital came from its revenues over the years, and not from an infusion of funds from another source (such as the PLO or the PA). He explained that the PMA took required reserves from commercial banks and invested that amount, and then used the investment revenue to pay expenses; the PMA had its account at the PIB. Thus, a 2003 PMA circular which provided certain operating rules for banks in the Palestinian Territories required that they cover their current accounts in dollars by transferring reserves to the PMA's account with the PIB at the BNY. According to Abu-Habsa, all of the frozen BNY accounts were commercial bank reserves belonging to those banks; however, he did not know whether the funds were required reserves or were reserves with interest.

Jessica Goodwin, a long-time BNY employee who had effected the freeze, identified the BNY's summary list of the transfers in the frozen "suspense account," with the PMA as the originator of 14 transfers and the beneficiary of five transactions totaling about $30 million; all of the PMA transactions were bank-to-bank transfers.

The PIB's general manager, Usama Mohamed Khader, confirmed that the PMA had its clearinghouse account with the PIB, which was used in the checks and payments settlement process between banks, and testified that the BNY freeze evoked complaints from the affected commercial banks that owned the funds.

Abed, the PMA governor, reiterated the contents of his affidavit regarding the PMA's role as a regulator, details of its enabling law (the MAL) and its failure to issue currency or hold gold reserves despite the law's "aspirational" provisions. He opined, based on his prior experience with the International Monetary Fund, that, with the above exceptions, the PMA's operations were typical of central banks. He denied taking any direction from the PLO, the PA, or any other government officials. He denied that the PMA is the "fiscal agent" for the PLO or the PA.

Abed explained that the PMA invests the reserves deposited by the commercial banks and keeps some of the interest, thereby generating a profit for itself. After paying expenses, it then pays over the remainder of the profit to the PA as required under the MAL.

Significantly, the court precluded the Ungars' attempts to cross-examine Abed regarding any discussions he may have had with the PA ministry of finance or anyone at the PA concerning the instant judgment.

A central bank expert called by the PMA, who had worked for the Federal Reserve and the International Monetary Fund, also opined, over the Ungars' objection, that the frozen funds belonged to the commercial banks. Notably, when the Ungars' wire transfer expert testified about the mechanics of such transfers, on cross-examination the PMA's counsel referred to UCC article 4-A, which governs wire transfers. However, at the hearing, the PMA's counsel did not use the statute substantively to attack the Ungars' claims.

At the conclusion of the hearings, the parties submitted post-hearing memoranda and briefs. The PMA, for the very first time, relied on Uniform Commercial Code 4-A-502 and 4-A-503 to assert that the Ungars' judgment could not be enforced against funds in an intermediary bank like the BNY during a wire transfer and that anyway, title to the funds had passed from the PMA. The focus thus shifted to the issue of ownership of the funds during transfer, and specifically their ownership once they reached the intermediary bank, the BNY, as determined by the provisions of UCC article 4-A.

In an order entered October 21, 2005 (2005 NY Slip Op 30410[U]), the motion court, inter alia, modified the state restraining notice by deleting the restraint against the PMA on the grounds that pursuant to UCC article 4-A the BNY holds no property belonging to the PMA because all funds frozen by the BNY were transfers. At that juncture, the court held that title to the funds had passed from the PMA. The court, however, recognized that the funds were still restrained pursuant to the federal injunction, but nevertheless found that the PMA was likely to prevail on the issue of its separate status from the PA. Thus, it granted the preliminary injunction and ordered the funds released upon a posting of a $30 million bond.*

Further, the action against the BNY was dismissed upon a stipulation of the parties. Finally, the court acknowledged that discovery was limited and that upon full discovery the evidence might show the PMA does hold funds of the PA or the PLO. The court therefore subsequently made a verbal order approving discovery. However, despite repeated requests and the submission to the court of a discovery deficiency summary, no discovery was forthcoming.

---

* In fact, the PMA funds at the BNY have not been released because other judgment creditors of the PA have restrained them in enforcement proceedings brought in federal court. The federal court stayed proceedings in that case pending this Court's disposition of the instant appeal.

On December 23, 2005, the Ungars served a restraining notice on the PMA, restraining it from transferring its 2005 net profits to the PA, payable to the PA according to the MAL. Two months later, the Ungars filed an order to show cause seeking turnover of those profits pursuant to CPLR 5225 and 5227. In April 2006, the PMA opposed and cross-moved stating that the PA had waived the taking of its profits. On June 30, 2006, the PMA filed a motion for summary judgment seeking final resolution of all claims, counterclaims and cross claims. It further sought a release of the restrained funds and a protective order barring discovery. The Ungars cross-moved to amend their counterclaim to assert a claim against the PA for fraudulent conveyance and "money had and received," because the PA had waived receipt of the PMA's 2005 profits.

In an order and judgment (one paper) entered April 10, 2007 (15 Misc 3d 1006 [2007]), the court determined that the PMA's status as a separate juridical entity was a nonjusticiable issue preempted by a Treasury Department determination. The court further held that even if it was a justiciable question, the restrained funds would have to be released on the grounds that UCC article 4-A prohibits restraint by an intermediary bank, and that, in any event, title to the funds had passed from the PMA. Additionally, the court held that it cannot order the turnover of the PA funds held by the PMA outside the jurisdiction in the Palestinian Territories. It dismissed the Ungars' counterclaims for a contrary declaration and their cross claim for turnover of the PMA's funds, and denied the Ungars' request to amend their complaint to assert claims of fraudulent conveyance and "money had and received"; it further denied the Ungars' motion to compel discovery and the PMA's motion for a protective order as moot. The Ungars timely appealed from the orders entered October 21, 2005 and April 10, 2007.

On appeal, the Ungars argue that the motion court erred in holding that the issue of the PMA's relationship with the PA is nonjusticiable. The Ungars assert that, in fact, the PMA is ultimately controlled by the PA and the PLO as a shield for their financial activities. They further argue that the PA's waiver of 2005 profits from the PMA constitutes a conveyance subject to a claim for fraudulent conveyance and "money had and received"; that the motion court misinterpreted the provisions of UCC article 4-A; and that the enjoined wire transfers are subject to turnover.

The PMA asserts that the court correctly found that the BNY holds no property of the PMA because when the funds were

restrained title had passed from the PMA pursuant to UCC article 4-A; further that the restrained funds are, in any event, commercial bank reserves belonging to commercial banks in the Palestinian Territories and other third parties. It further asserts that the court properly determined that its profits are beyond the jurisdictional reach of the New York courts because the situs of its debt to the PA is in Palestine, not New York. The PMA denies that its filing of this action in New York subjects it to jurisdiction here. It further asserts that the motion court was right in holding that its independence from the PA has been preemptively decided in a U.S. Treasury Department Office of Foreign Assets Control (hereinafter referred to as OFAC) license that refers to it as an "independent agent." For the reasons that follow, we reverse, and remand the matter for further proceedings consistent with this decision.

There are three lines of inquiry on which the court should have ordered full discovery: First, whether the PMA is the alter ego or agent of the PA or the PLO so that the restrained funds, if owned by the PMA, can be levied to enforce the judgment. Second, whether the PMA holds any funds or owes any debts to the PA that could be subject to restraint or turnover pursuant to CPLR article 52, even if PMA is a separate legal entity. Third, whether the funds restrained in the BNY, in fact, belong to the PMA to the extent that they can be made subject of a turnover order to satisfy the judgment against the PA and the PLO.

As a threshold matter, the court incorrectly determined in its October 2005 order that the PMA meets all the features of an independent government instrumentality as outlined in *First Nat. City Bank v Banco Para el Comercio Exterior de Cuba* (462 US 611, 626-627 [1983] [hereinafter referred to as *Bancec*]). The court observed that under *Bancec*, there is a presumption in the PMA's favor that it is a separate juridical entity insulated from responsibility for the PA's obligations.

In *Bancec*, however, the government in question was Cuba, a sovereign state. Here it is undisputed that the PA is not a sovereign state. (*Ungar v Palestine Liberation Org.*, 402 F3d 274, 292 [1st Cir 2005]; *see also Biton v Palestinian Interim Self-Government Auth.*, 510 F Supp 2d 144, 147 [D DC 2007] [holding that PA cannot assert a sovereign immunity defense].)

There is no case on record that extends the *Bancec* standard to any entity other than a sovereign state, and the court below had no basis to invest the PA with the rights and privileges accorded to a sovereign state since that is a legislative function.

Because *Bancec* does not apply, the presumption of independence was attributed to the PMA in error. The burden, in fact, lies with the PMA to show that it is a separate entity and not the alter ego of the PA. The PMA has not satisfied that burden. On the contrary, evidence and testimony at the hearings tended to support the contention that the PMA is legally indistinguishable from the PA.

■ Second, the court in its April 2007 order incorrectly determined that the issue of the PMA's separate entity status was a nonjusticiable political question under *Baker v Carr* (369 US 186 [1962]), the seminal Supreme Court case that sets the criteria for determination of justiciability. In this case, the court observed that the issue of the PMA's status had already been determined by OFAC, an agency of the Treasury Department, and therefore it was nonjusticiable because deference is due to the executive branch in the conduct of foreign affairs.

However, the court misinterpreted the OFAC characterization of the PMA as an "independent agency" to mean that the executive branch had determined that the PMA was legally distinct from the PA. As the Ungars correctly assert, the opposite conclusion is indicated.

The OFAC license at issue here, General License No. 4, set out to name those *parts of the PA* government that OFAC believed were not controlled by Hamas personnel, and therefore those parts of the PA with whom U.S. persons can deal. It lists entities, including the PMA, with which U.S. persons are authorized to engage in transactions "otherwise prohibited" in another publication, titled OFAC's Guidelines on Transactions with the Palestinian Authority. In other words, the OFAC license must be seen as a list of entities that are part of the PA but against whom OFAC sanctions do not apply. As the Ungars correctly contend, the license at issue is a list of *parts of the PA* with whom U.S. persons can deal. Thus, the OFAC license tends to support a conclusion opposite to that reached by the court below, namely, that in fact the PMA and the PA are the same legal entity.

Nor would the OFAC license as a statement of the Department of Treasury preclude a judicial determination on the PMA's status. The enactment of the Anti-Terrorism Act, providing a civil remedy for American victims of terrorist acts, clearly represents a policy determination by Congress that courts are to be involved in such matters and there is no preclusive political question component. (*See Weiss v National Westminster Bank, PLC*, 242 FRD 33, 46-48 [ED NY 2007].)

As to the issue of whether the PMA, even if it is a separate entity, holds or controls any funds of the PA or PLO, like the 2005 profits that should have been paid to the PA, and which the Ungars sought to restrain, the court held that BNY "holds no property of PMA[ ] which may be restrained pursuant to [a]rticle 52 [CPLR 5222 (b)]." (2005 NY Slip Op 30410[U] at *18.)

The court also rejected the Ungars' claim of fraudulent conveyance against the PA arising out of PA's waiver of receipt of PMA's 2005 profits. The court held that no conveyance of property had taken place and reasoned that

"the PA had no property interest in or control of the 2005 annual profits of the PMA. The MAL provided that the decision as to whether any of these profits would be transferred to the PA lies with the PMA Board. Consequently, the profits always belonged to the PMA and were never conveyed in violation of New York's Debtor and Creditor Law." (15 Misc 3d at 1019.)

This was error in several respects. We agree with the Ungars that under the specific language of MAL articles 12-13, the PMA *must* transfer its profits to the PA unless the PA specifically agrees to waive such payment by the PMA. The waiver by the PA dated February 7, 2006 which purports to relinquish any claim to the 2005 PMA profits has no preclusive effect for two reasons.

First, the waiver was granted after the funds at issue were frozen pursuant to a prior judgment; and second, the Debtor and Creditor Law plainly contemplates just such a "waiver." Debtor and Creditor Law § 270 defines the term "[c]onveyance" as including "every payment of money, assignment, *release* [or] transfer . . . of tangible or intangible property" (emphasis added).

Debtor and Creditor Law § 273-a provides that

"[e]very conveyance made without fair consideration when the person making it is a defendant in an action for money damages or a judgment in such an action has been docketed against him, is fraudulent as to the plaintiff in that action without regard to the actual intent of the defendant if, after final judgment for the plaintiff, the defendant fails to satisfy the judgment."

Thus, the Ungars were only required to demonstrate that the release or "waiver" was made without fair consideration, that the PA has a judgment docketed against it, and that the PA has failed to satisfy the judgment. The record fairly supports all three requirements.

Of course, this does not end the inquiry. While the PMA may be subject to the remedies of the Debtor and Creditor Law and, as a conveyee under the jurisdiction of the court, could be ordered to deliver even out-of-state assets of the judgment debtor to the judgment creditors (see Miller v Doniger, 28 AD3d 405 [1st Dept 2006]), the focus of this appeal remains on the funds restrained in the BNY and whether they are the property of the PMA or the PA to the extent that the BNY could be ordered to turn them over to the Ungars.

The transactions at issue involve approximately $30 million where the PMA was either the originator of the payment orders that initiate a wire-fund transfer or a beneficiary. As to those restrained funds, the motion court made the following determinations: that restraint of the funds violated UCC 4-A-503 because an intermediary bank like the BNY cannot be restrained from acting with respect to a funds transfer; and that the PMA did not own the restrained funds because pursuant to UCC article 4-A, title to the funds had passed when the PMA's bank, the PIB, executed the payment orders.

The court buttressed its holding by relying on two decisions of this Court. In Bank of N.Y. v Norilsk Nickel (14 AD3d 140, 145-146 [1st Dept 2004], lv dismissed 4 NY3d 846 [2005]) we held that, pursuant to UCC 4-A-502 (4) and 4-A-503, title to the funds passed when the originator's payment order was executed upon transmittal to the intermediary bank, in which case the intermediary bank cannot be restrained. (See also European Am. Bank v Bank of Nova Scotia, 12 AD3d 189 [1st Dept 2004] [attachment of funds at intermediary bank held invalid].)

UCC 4-A-503 is titled "Injunction or Restraining Order With Respect to Funds Transfer" and provides that a court may restrain a person from issuing a payment order to initiate a funds transfer or an originator's bank from executing the payment order of the originator, but "[a] court may not otherwise restrain a person from issuing a payment order . . . or otherwise acting with respect to a funds transfer."

In Norilsk, a Serbian export company, Genex, originated funds transfers by issuing payment orders to its bank, Midland Bank, to transfer more than two million dollars to Norilsk, a company

in the Soviet Union. Midland executed the order by sending a payment order to the BNY, the intermediary bank where Norilsk's bank, the International Moscow Bank, maintained a correspondent account for funds transfers in dollar transactions. The BNY accepted the payment order but froze the funds transfers pursuant to an Executive Order and OFAC regulations, the objective of which was to impose economic sanctions on Serbia by blocking its access to its property and interests.

Approximately 10 years later, in 2003, all funds frozen pursuant to the OFAC regulations were released and the same release also authorized any person or government seeking attachment or restraint with respect to any property subject to the pending unblocking to do so. By the time Norilsk asked the BNY to unblock the funds in question, two creditors of Genex had served process on the BNY with respect to those funds.

One creditor served a restraining notice on a previously obtained judgment. The second creditor served an order of attachment directing levy on an amount transferred between Norilsk and Genex. (*Norilsk*, 14 AD3d at 144.) The BNY refused to complete the funds transfers originated by Genex in favor of Norilsk in light of the competing claims, and sought interpleader relief against Norilsk and the two creditors. This Court applied UCC article 4-A and found that title had passed from Genex when Midland Bank accepted Genex's payment orders and executed them by transmitting the payment orders to the BNY. It also found that a court cannot restrain an intermediary bank from completing a funds transfer. (*Norilsk*, 14 AD3d at 145.)

In this case, the facts are far less clear-cut. Here, the funds were frozen after the BNY was served with an information subpoena and a statutory restraining notice pursuant to CPLR 5222. Information subpoenas that were in essence "fishing expeditions" were sent to a number of financial institutions which the judgment creditors suspected held assets of the PA and the PLO, and of other entities in which the PA and the PLO had an interest, like the PMA. The subpoenas included questions about accounts and the value of those accounts as well as the indebtedness of the financial institution to the judgment debtors. The restraining notice read as follows:

> "[w]hereas it appears that you owe a debt to the judgment debtors . . . or are in possession or in custody of property in which one or more judgment-debtors has an interest . . . you are hereby forbid-

den to make or suffer any sale, assignment or transfer of, or any interference with any such property or pay over . . . any such debt."

■ Thus, neither the state restraining notice nor the federal injunction specifically restrained funds transfers, nor enjoined a specific funds transfer or transfers from completion. Neither injunction was aimed at the particular funds transfers that were subsequently restrained. Clearly, the word "transfer" in the injunction and state restraining notice is not used in the same way as in the term of art, "wire-fund transfer." Additionally, in this case, it was the BNY who chose to obey the court order and froze funds, all of which happened to be wire-fund transfers. The BNY sought no relief with regard to the injunctions. Consequently, we do not find that the order by which BNY restrained the funds was improper or a violation of UCC 4-A-503.

Moreover, we find persuasive the Ungars' argument that nothing in UCC 4-A-502 prohibits the bank from honoring creditor process to turn over the funds. The Ungars point to UCC 4-A-502 (4) which provides as follows:

"Creditor process with respect to a payment by the originator to the beneficiary pursuant to a funds transfer may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary. Any other bank served with the creditor process *is not obliged to act* with respect to the process." (Emphasis added.)

The Ungars assert that the plain meaning of the provision is that it allows a bank to honor the process if it so chooses but it does not always have to honor that process.

Their contention is supported by the rationale for the UCC article 4-A provisions which the Comment explains is that "[i]n particular, intermediary banks are protected." (McKinney's Cons Laws of NY, Book 62½, UCC 4-A-503, Comment, at 685 [2001 ed].) A federal court decision written barely a year after adoption by New York of UCC article 4-A is illuminating on the issue. In *Manufacturas Intl., LTDA v Manufacturers Hanover Trust Co.* (792 F Supp 180 [ED NY 1992], *affd* 47 F3d 1159 [1995], *cert denied* 515 US 1132 [1995]), an intermediary bank agreed to seize funds in response to a court order. The plaintiff brought an action to hold the bank liable. The court held that no such liability was justified. It observed:

"[S]ection 4A-503 of the U.C.C. . . . recognizes that

banks have an obligation to respond to court orders . . . The Official Comment states that 'intermediary banks are protected,' meaning that since the time in transit for funds transfers is brief, intermediary banks cannot be expected to comply with injunctions by creditors . . . The Comment suggests that intermediary banks should not be exposed to liability under article 4A for *declining* to stop funds transfers where creditors are seeking the funds. In the instant case, the opposite situation is presented. Plaintiffs wish to hold the intermediary banks liable for *agreeing* to seize the funds. No such liability is justified." (*Id.* at 194 [citation omitted].)

In this case, in fact, the PMA discontinued its claim against the BNY, essentially agreeing that the BNY cannot be held liable for choosing to restrain wire-fund transfers.

The more relevant, although much more perplexing, issue is that of ownership of the funds. In its first order of October 2005, the court, upon a lengthy analysis of the 17 transactions and based upon the testimony and evidence presented at the four-day August 2005 hearing, determined that the funds did not belong to the PA, the PLO or the PMA, but to private banks. It further held that the PMA was correct in arguing that pursuant to UCC article 4-A once the PIB executed the PMA's payment orders, title to any funds associated with those payment orders transferred to the PIB as the correspondent bank holding the account with the BNY. Similarly, argued the PMA, it did not have title to funds that were being transferred to the PMA as designated beneficiary, and which the BNY placed in the suspension account.

Based on a strict reading of our determinations in *Norilsk* and *Bank of Nova Scotia*, the court would be correct. Further, there is no direct conflict with any specific statute as there was in *Winter Storm Shipping, Ltd. v TPI* (310 F3d 263 [2d Cir 2002], *cert denied* 539 US 927 [2003] [conflict between admiralty rules for maritime attachment and UCC 4-A-503]; *see also Sigmoil Resources v Pan Ocean Oil Corp. [Nigeria]*, 234 AD2d 103, 104 [1st Dept 1996], *lv dismissed* 89 NY2d 1030 [1997] ["'(n)either the originator who initiates payment nor the beneficiary who receives it holds title to the funds in the account at the correspondent bank"]).

As the Comment to UCC 4-A-502 states, "[a] creditor of the originator can levy on the account of the originator in the

originator's bank before the funds transfer is initiated" but "[t]he creditor of the originator cannot reach any other funds because no property of the originator is being transferred." (McKinney's Cons Laws of NY, Book 62½, UCC 4-A-502, Comment 4, at 683-684.) Indeed, while contrary to the intuitive assumption that funds are transferred from bank to bank, there is no actual tangible property being passed on down the line that may be intercepted along the way. That is because what the originator owns as a customer maintaining an account is neither money nor funds; rather the customer is owed a debt by the bank. (1-2 The Law of Electronic Funds Transfers § 2.08 [6], citing exposition in United Kingdom case, *Foley v Hill*, 2 HL Cas 28, 9 Eng Rep 1002 [1848].)

> "[W]hen the originator's bank executes the originator's payment order, it debits the originator's account in discharge of the originator's obligation to the originator's bank. From that point on, the debt owed by the originator's bank to the originator has been discharged to the extent of the amount debited, so that with respect to such amount, no originator's property exists anymore in the hands of the originator's bank, or anywhere else. Similarly, having executed the payment order sent to it by the originator's bank, the first intermediary bank becomes entitled to payment from the originator's bank. Such payment can be obtained by means of a debit to an account of the originator's bank maintained on the books of the first intermediary bank. At that point, it is not the property of the originator, but rather, the property of the originator's bank, in the form of a debt owed to the originator's bank by the intermediary bank." (*Id.*, referencing UCC 4-A-402 [3]; 4-A-209 [1].)

In a regular transaction, BNY would have accepted and executed the wire transfer by sending a payment order to either a correspondent bank with the BNY or to another intermediary bank and then would have debited the amount from the PIB's account. In this case, the BNY did not issue a payment order but rather "debited" the amount by freezing it in the suspense account, thus interrupting the usual transfer of rights and obligations. Thus, the debt owed appears to be to the PIB, not the PMA.

Here, however, a further step is required that was not required in *Norilsk* before determining that title passed to the

PIB; that is, to ascertain the relationship between the PMA and the PIB: If the PIB, under the correspondent bank relationship with the BNY, is merely an agent for collection for its depositors, then title did not pass to the PIB. (*See Sidwell & Co. v Kamchatimpex,* 166 Misc 2d 639, 641 [Sup Ct, NY County 1995] [when TRO served was irrelevant "(i)f (foreign bank) is an agent for collection, thus never obtaining title to the funds in (its) account"].)

In the PMA's June 6, 2005 order to show cause, the PMA annexed the affidavit of the governor of the PMA asking for a preliminary injunction directing the BNY to release the block on all funds resulting from transfer orders by the PIB on behalf of the PMA and "to honor all pending and future incoming and outgoing transactions by the PMA through the PIB or *any other agent* designated by the PMA." (Emphasis added.)

Testimony at the August hearing established only the following: that the PIB opened its correspondent account with the BNY in 2001 and that the PMA opened its account with the PIB in 2003. A regulation issued by the PIB to all the banks in the Palestinian Territories states that the PIB is authorized/accredited as a clearing bank to clear all transactions in dollars, shekels and the reserve in euro. All banks working in the Palestinian Territories have to cover their current accounts in dollars by remittance to the account of the PMA at the PIB at the BNY. The PIB settles the PMA's dollar transactions through the PIB's account at the BNY.

An exhibit attached to the Ungars' posthearing memorandum was an excerpt from the Economist Intelligence Unit found on the Internet, dated June 25, 2004, and read as follows:

> "The Palestinian leader, Yasser Arafat, is considering the appointment of a new governor and board of the Palestinian Monetary Authority . . . following a call by the Palestinian Legislative Council (PLC) for the dismissal of the current governor, Amin Haddad. The call came after a PLC investigation accused Mr. Haddad of corruption and mismanagement in his administration of Palestine International Bank. *The PMA assumed control over the bank in 1999.*" (Available at 2004 WLNR 6551113 [emphasis added].)

▉ Nevertheless this is insufficient evidence as to the true nature of the financial arrangements between the PIB and its depositors such as the PMA. The burden of coming forward and demonstrating that the PIB obtained title to the funds in the PIB account rests with the PMA.

Ultimately, the PMA has the burden of proof on the issues of its separate juridical entity status, its assertions that the PA had no property interest in the PMA profits, that it does not hold or control any funds of the PA and that it owes no debts to the PA or the PLO, as well as on the issue of the PIB obtaining title to the funds transfers restrained by the BNY. Additionally, a related issue is the underlying obligation between the originating party and beneficiary and whether it has been satisfied pursuant to UCC 4-A-406 (2). Here, the burden is also on the PMA to demonstrate the frozen funds are anything other than the assets of the PMA. In the light of the foregoing, the Ungars must be permitted to conduct full discovery on these issues.

Accordingly, the order of the Supreme Court, New York County (Shirley Werner Kornreich, J.), entered October 21, 2005, which, inter alia, modified a restraining order to delete the restraint against the Palestine Monetary Authority, granted the PMA's motion for a preliminary injunction, and directed the Bank of New York to release a restraint on all funds resulting from transfer orders on the PMA's behalf and to honor all the PMA's pending and future transactions, and the order and judgment (one paper) of the same court and Justice, entered April 10, 2007, to the extent that it granted the PMA's motion for summary judgment, declared that it is a separate juridical entity from the Palestinian Authority and that the restrained funds should be released, and which dismissed the judgment creditors' counterclaims and cross claims against the Bank of New York for a turnover of the restrained funds, should be reversed, on the law, with costs, PMA's motions denied, the counterclaims and cross claims reinstated and the matter remanded for further proceedings consistent herewith.

MAZZARELLI, J.P., SAXE and BUCKLEY, JJ., concur.

Order, Supreme Court, New York County, entered October 21, 2005, and order and judgment (one paper), same court, entered April 10, 2007, reversed, on the law, with costs, the Palestine Monetary Authority's motions denied, the counterclaims and cross claims reinstated and the matter remanded for further proceedings consistent herewith.

[Next page is 401.]