[36 NYS3d 95]

THE RECEIVERS OF SABENA SA, Respondent, v DEUTSCHE BANK A.G. et al., Appellants.

First Department, July 14, 2016

**APPEARANCES OF COUNSEL**

*Seward & Kissel LLP*, New York City (*Michael B. Weitman* and *Dale C. Christensen, Jr.* of counsel), for appellants.

*Cardillo & Corbett*, New York City (*James P. Rau* of counsel), for respondent.

*Sullivan & Cromwell LLP*, New York City (*Bruce E. Clark* and *H. Rodgin Cohen* of counsel), for Clearing House Association L.L.C., amicus curiae.

*Meghann E. Donahue, Thomas C. Baxter, Jr., Stephanie A. Heller* and *Shari D. Leventhal*, New York City, for Federal Reserve Bank of New York, amicus curiae.

## OPINION OF THE COURT

FRIEDMAN, J.

This appeal concerns an electronic funds transfer (EFT), governed by article 4-A of the Uniform Commercial Code, that was frozen for more than a decade at a New York intermediary bank pursuant to a federal executive order. The question to be answered is whether, upon the federal government's issuance of a license permitting the release of the funds, the intermediary bank had an obligation, enforceable by the beneficiary, to complete the EFT by issuing an order to the beneficiary's bank to pay the beneficiary. We hold that the intermediary bank had no such obligation.

As more fully discussed below, article 4-A of the UCC furnishes "the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation [it] cover[s]" (UCC 4-A-102, Comment), and "[a] bank owes no duty to any party to the funds transfer except as provided in . . . Article [4-A] or by express agreement" (UCC 4-A-212). Article 4-A plainly provides that, in the absence of an express agreement, an intermediary bank receiving a payment order as part

of an intended EFT, even in the absence of any outside interference, has no obligation to complete the EFT (UCC 4-A-212). In this case, the EFT was canceled by operation of law when it was not completed within five business days (UCC 4-A-211 [4]). That cancellation cut off the intermediary bank's option to accept the payment order it had received from the originator's bank (UCC 4-A-211 [5]) and triggered the right of the originator's bank to a refund from the intermediary bank to the extent the originator's bank had already paid the intermediary bank with respect to the transaction (UCC 4-A-402 [3], [4]). Thus, the beneficiary of the EFT did not hold title to the funds— which were in fact just a credit in a bank account—in the figurative possession of the intermediary bank while in transit.[1] Further, because the intermediary bank's return of the funds to the originator's bank fully complied with the requirements of article 4-A, no common-law claim for conversion may be predicated on that conduct. Nor does the federal license that permitted the release of the funds give rise to any cause of action against the intermediary bank on the part of the beneficiary. We therefore reverse the order appealed from and grant the defendant intermediary bank's motion to dismiss the complaint filed by the receivers of the beneficiary, who are the plaintiffs in this action.

Before turning to the allegations of the complaint and the issues raised for determination, an overview of how EFTs operate under UCC article 4-A may be helpful. Article 4-A of the UCC applies to "funds transfers" (UCC 4-A-102) and UCC 4-A-104 (1) defines that term—which includes, but is not limited to, transfers effected electronically (*see Banque Worms v BankAmerica Intl.*, 77 NY2d 362, 369 n 1 [1991])—to mean

> "the series of transactions, beginning with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. The term includes any payment order issued by the

---

**1.** An EFT is "a chained series of debits and credits" (*Calderon-Cardona v Bank of N.Y. Mellon*, 770 F3d 993, 1001 [2d Cir 2014], *cert denied* 577 US —, 136 S Ct 893 [2016]), in which "no property of the originator is being transferred" (UCC 4-A-502, Comment 4). As this Court has explained, "while contrary to the intuitive assumption that funds are transferred from bank to bank, there is no actual tangible property being passed on down the line . . . because what the originator owns as a customer maintaining an account is neither money nor funds; rather the customer is owed a debt by the bank" (*Palestine Monetary Auth. v Strachman*, 62 AD3d 213, 229 [1st Dept 2009]). Still, we here follow the universal convention of using the term "funds" metaphorically in this context.

originator's bank or an intermediary bank intended to carry out the originator's payment order. A funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's payment order."

Article 4-A defines the term "payment order" to mean

"an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:

"(i) the instruction does not state a condition to payment to the beneficiary other than time of payment,

"(ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from, the sender, and

"(iii) the instruction is transmitted by the sender directly to the receiving bank or to an agent, funds-transfer system, or communication system for transmittal to the receiving bank" (UCC 4-A-103 [1] [a]).[2]

The United States Court of Appeals for the Second Circuit has given the following description of the manner in which

---

**2.** The following additional statutory definitions, set forth in pertinent part, are relevant to this appeal:

(1) " 'Beneficiary' means the person to be paid by the beneficiary's bank" (UCC 4-A-103 [1] [b]).

(2) " 'Beneficiary's bank' means the bank identified in a payment order in which an account of the beneficiary is to be credited pursuant to the order" (UCC 4-A-103 [1] [c]).

(3) " 'Receiving bank' means the bank to which the sender's instruction is addressed" (UCC 4-A-103 [1] [d]).

(4) " 'Sender' means the person giving the instruction to the receiving bank" (UCC 4-A-103 [1] [e]).

(5) " 'Intermediary bank' means a receiving bank other than the originator's bank or the beneficiary's bank" (UCC 4-A-104 [2]).

(6) " 'Originator' means the sender of the first payment order in a funds transfer" (UCC 4-A-104 [3]).

(7) " 'Originator's bank' means . . . the receiving bank to which the payment order of the originator is issued if the originator is not a bank" (UCC 4-A-104 [4]).

(8) "[A] receiving bank other than the beneficiary's bank accepts a payment order when it executes the order" (UCC 4-A-209 [1]).

funds transfers (most of which are EFTs) operate under article 4-A:

"An EFT is nothing other than an instruction to transfer funds from one account to another. When the originator and the beneficiary each have accounts in the same bank[,] that bank simply debits the originator's account and credits the beneficiary's account. When the originator and beneficiary have accounts in different banks, the method for transferring funds depends on whether the banks are members of the same wire transfer consortium. If the banks are in the same consortium, the originator's bank debits the originator's account and sends instructions directly to the beneficiary's bank upon which the beneficiary's bank credits the beneficiary's account. If the banks are not in the same consortium—as is often true in international transactions—then the banks must use an intermediary bank. To use an intermediary bank to complete the transfer, the banks must each have an account at the intermediary bank . . . . After the originator directs its bank to commence an EFT, the originator's bank would instruct the intermediary to begin the transfer of funds. The intermediary bank would then debit the account of the bank where the originator has an account and credit the account of the bank where the beneficiary has an account. The originator's bank and the beneficiary's bank would then adjust the accounts of their respective clients" (*Shipping Corp. of India Ltd. v Jaldhi Overseas Pte Ltd.*, 585 F3d 58, 60 n 1 [2d Cir 2009], *cert denied* 559 US 1030 [2010] [*Jaldhi*]).

Similarly, the Permanent Editorial Board for the UCC has summarized the operation of a funds transfer within the meaning of UCC article 4-A as follows:

"A funds transfer is a series of payment orders starting with an originator's order to the originator's bank to cause a sum certain amount of money to be paid to a beneficiary. The series of payment orders culminates with a beneficiary bank crediting

---

(9) "A payment order is 'executed' by the receiving bank when it issues a payment order intended to carry out the payment order received by the bank" (UCC 4-A-301 [1]).

the account of a beneficiary for that sum certain . . . . The series of payment orders is a mechanism used to make a transfer of value through the debiting and crediting of bank accounts from the originator to the beneficiary. The funds transfer often involves one or more intermediary banks that receive a payment order from the originator's bank or another bank. The receiving intermediary bank then issues its own payment order to another intermediary bank or the beneficiary's bank" (Permanent Editorial Board for the Uniform Commercial Code, PEB Commentary No. 16, Sections 4A-502 [d] and 4A-503 at 1 [2009]).[3]

We now turn to the factual allegations of the complaint, which, on this appeal from an order determining a CPLR 3211 (a) (7) motion to dismiss, are assumed to be true.[4] The beneficiary of the EFT at issue in this action, and the predecessor in interest of plaintiffs in this action, was Sabena SA, the former national airline of Belgium.[5] Part of Sabena's business was providing aircraft repair and maintenance services to other airlines. Among Sabena's customers for repair and maintenance services was Sudan Airways Ltd., which is not a party to this action.

On November 4, 1997, Sudan Airways originated an EFT to Sabena, as beneficiary, in the amount of $360,500, to pay for

---

**3.** The Permanent Editorial Board for the UCC is a body that acts under the authority of the organizations that promulgated the UCC (including article 4-A), the American Law Institute and the Uniform Law Commission, also known as the National Conference of Commissioners on Uniform State Laws (PEB Commentary No. 16, Preface).

**4.** Although we are in any event required to assume the truth of the allegations of the complaint, there does not appear to be any substantial dispute between the parties concerning the underlying facts of this matter.

**5.** In 2001, subsequent to the initiation of the 1997 EFT that gives rise to this litigation, a Belgian court declared Sabena to be bankrupt and appointed five individuals to act as its receivers for the purpose, among others, of collecting amounts owed to the company. In 2012, the receivers commenced this action to recover damages allegedly owed to Sabena. Because the distinction between Sabena and its receivers has no bearing on the issues presented, this writing uses the name "Sabena" to refer to the company and its receivers interchangeably. We note that Supreme Court rendered the order under review after receiving a letter from each side's counsel concluding, in agreement with each other, that, although Sabena was the debtor in a pending ancillary bankruptcy proceeding in the United States Bankruptcy Court for the Southern District of New York, this action seeking to recover damages allegedly owed to Sabena was outside the bankruptcy court's exclusive jurisdiction.

technical services that Sabena had contracted to provide for two Sudan Airways aircraft.[6] The EFT was wired from the National Bank of Abu Dhabi (NBAD), as the originator's bank, to Bankers Trust in New York, as intermediary bank, for further transmission to Generale Bank in Brussels, as the beneficiary's bank, where Sabena maintained accounts. Bankers Trust's successor in interest is defendant Deutsche Bank Trust Company Americas (DBTCA), a New York corporation with its principal place of business in New York City.[7]

Although, as noted, the EFT had been intended to reach its terminus at the beneficiary's bank in Belgium, it came to a halt at DBTCA, the intermediary bank in New York. This was due to an executive order that had been issued by the President of the United States the day before Sudan Airways initiated the EFT. Specifically, on November 3, 1997, President Clinton, pursuant to his authority under the International Emergency Economic Powers Act (50 USC § 1701 *et seq.*) and the National Emergencies Act (50 USC § 1601 *et seq.*), and based on a finding that the Government of Sudan posed a threat to the national security of the United States, issued an executive order providing, in pertinent part, that "all property and interests in property of the Government of Sudan that are in the United States, that hereafter come within the United States, or that hereafter come within the possession or control of United States persons . . . are blocked" (Executive Order [Clinton] No. 13067 of 1997 [62 Fed Reg 59989 (1997)]). Executive Order 13067 defines the term "Government of Sudan" to include, inter alia, that government's "agencies, instrumentalities and controlled entities."[8]

---

**6.** According to the complaint, the EFT was in payment of two invoices (which are not in the record), each of which was "for work to be performed" under the relevant service contract. The complaint further alleges that "Sabena fully and correctly performed all the work described" in the invoices.

**7.** Because the distinction between Bankers Trust and DBTCA has no bearing on the issues presented, this writing uses the term "DBTCA" to refer to Bankers Trust and DBTCA interchangeably. The action is also brought against defendant Deutsche Bank A.G. (DB), which is alleged to be the German indirect owner of DBTCA. Neither NBAD, the originator's bank, nor Generale Bank, the beneficiary's bank, is a party to this action.

**8.** Executive Order 13067 states that the Government of Sudan was found to "constitute an unusual and extraordinary threat to the national security and foreign policy of the United States" based on Sudan's "continued support for international terrorism; ongoing efforts to destabilize neighboring governments; and the prevalence of human rights violations, including slavery and the denial of religious freedom."

On July 1, 1998, the Office of Foreign Assets Control (OFAC) of the United States Department of the Treasury issued detailed regulations to carry out the purposes of Executive Order 13067 (31 CFR part 538). The regulations provide that "no property or interests in property of the Government of Sudan, that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons . . . may be transferred, paid, exported, withdrawn or otherwise dealt in" (31 CFR 538.201 [a]). It is undisputed that Sudan Airways falls within the regulatory definition of the term "Government of Sudan" (31 CFR 538.305).

On November 4, 1997, upon receiving NBAD's payment order for Sudan Airways' EFT to Sabena, DBTCA immediately blocked the order pursuant to Executive Order 13067, which, by its terms, had gone into effect at 12:01 a.m. that day. Accordingly, instead of accepting the payment order by executing it—i.e., by sending its own payment order to Generale Bank, the beneficiary's bank, for the benefit of Sabena (*see* UCC 4-A-209 [1]; 4-A-301 [1], quoted in pertinent part at n 2, *supra*)—DBTCA credited the funds to a segregated, interest-bearing account.[9] For the next 14 years and four months, the credit representing the EFT remained frozen.[10]

In 2009, Sabena, through counsel, applied to OFAC for a license, pursuant to subpart E of 31 CFR part 538, authorizing DBTCA to release the funds. In 2012, OFAC issued such a

---

**9.** We note that which party held title to the EFT in the hands of the intermediary bank under state banking law is an entirely different question from whether Sudan Airways is deemed to have had an "interest[ ]" (31 CFR 538.201 [a]) in the EFT for purposes of the federal sanctions regime. It is undisputed that Executive Order 13067 and the implementing regulations required DBTCA to block the EFT even though, as more fully discussed below, Sudan Airways did not hold title to the EFT under state law while it was in the possession of the intermediary bank.

**10.** Although the funds were frozen for more than 14 years, the credit did not remain in the same account for the entire period. In 2008, pursuant to a court order in a federal action commenced to enforce a judgment against Sudan held by survivors of the victims of the bombing of the USS Cole, DBTCA transferred the credit (including accrued interest) to the registry of the United States District Court for the Southern District of New York. DBTCA filed an interpleader petition in the federal action with respect to the funds, and Sabena filed a claim to the funds, objecting to their being turned over to satisfy the judgment of the Cole survivors. Ultimately, the federal district court, without ruling on the merits of Sabena's claim, issued an order releasing the funds back to DBTCA. In February 2012, the credit (including accrued interest) was transferred from the court's registry back to DBTCA, which again placed the credit in a segregated, interest-bearing account.

license. The license, dated March 5, 2012, is addressed to DBTCA, and states:

> "[DBTCA] blocked this transfer pursuant to U.S. sanctions administered by [OFAC]. OFAC has carefully reviewed the information presented and otherwise available to it in connection with this transfer and, based on the assertions made in the incoming application from Nankin & Verma PLLC [Sabena's counsel], has determined that [DBTCA] is authorized to release these funds."[11]

After the license was issued, Sabena's counsel contacted DBTCA to discuss the anticipated release of the EFT. After receiving Sabena's instructions for directing the funds to its account, DBTCA allegedly asked Sabena's counsel if it could "obtain a release from Sudan Airways and its bank, NBAD, 'as they may have claim to an interrupted wire transfer under the UCC.'" Sabena's counsel allegedly responded by "immediately ask[ing] if [DBTCA] was 'imposing a requirement that releases be provided before it transfers the funds to my client?'" According to the complaint, "[t]hat same day [DBTCA's] counsel advised that his client had released the funds to NBAD."

Based on the foregoing allegations, Sabena commenced this action against DBTCA in October 2012. Sabena's complaint asserts four causes of action, three of which (the first, second and fourth) are at issue on this appeal. The first cause of action is for DBTCA's "fail[ure] to remit the funds [upon OFAC's issuance of the license] to Sabena, the intended beneficiary under the wire transfer, as required by UCC Article 4A [sic]," on the theory that a federal block of an EFT is "a mere interruption in the wire transfer, and upon its removal, the previously restrained intermediary bank should proceed with the funds transfer by carrying it onward for payment to the intended beneficiary." The second cause of action alleges that, "[b]y sending the funds back to Sudan Airways via its bank, [DBTCA] violated . . . the License" by which OFAC had released the block of the EFT. Finally, the fourth cause of action asserts the theory that DBTCA's transfer of the funds back to NBAD upon the issuance of the license was "a distinct act of domain [sic] wrongfully exerted of [sic] [Sabena's] personal property in

---

11. The license, in identifying the subject EFT, names banks other than NBAD and Generale Bank as the originator's bank and the beneficiary's bank, respectively. This discrepancy has no bearing on the instant appeal.

denial of or inconsistent with its rights therein and constitutes conversion."

DBTCA responded to the complaint by moving to dismiss it for legal insufficiency pursuant to CPLR 3211 (a) (7). As it does on appeal, DBTCA argued that the complaint failed to state any cause of action because: (1) Sabena, as the beneficiary, had no property interest in the EFT while it was midstream; (2) DBTCA, as an intermediary bank, owed no duty to Sabena, the beneficiary, with respect to the EFT; and (3) upon the release of the federal block, the UCC's "money-back guarantee" provision obligated DBTCA to refund to the originator's bank any payment the latter had made for the unexecuted payment order. In opposition, Sabena relied on case law that, it argued, supported its position that, "where an EFT is interrupted at an intermediary bank by an attachment or government blocking order, the EFT must be released to the beneficiary" when the attachment or blocking order is lifted. Supreme Court, essentially agreeing with Sabena's reading of the case law, denied the motion to dismiss, although it dismissed the third cause of action, sua sponte, on jurisdictional grounds not raised by DBTCA.[12] As noted at the opening of this writing, upon DBTCA's appeal from Supreme Court's order insofar as it sustained Sabena's complaint, we reverse and grant the motion to dismiss.

We begin our analysis by reiterating that, as the Court of Appeals recognized shortly after article 4-A went into effect in this state, that article—which has been enacted by all 50 states and the District of Columbia, and has been adopted by the Board of Governors of the Federal Reserve System to govern the wire transfer service of the Federal Reserve Banks (see 12 CFR part 210, subpart B, Appendix B)—was enacted to remedy the previous lack of " '[a] comprehensive body of law that defines the rights and obligations that arise from wire transfers' " (Banque Worms v BankAmerica Intl., 77 NY2d at 369, quoting National Conference of Commissioners on Uniform State Laws and American Law Institute, Prefatory

---

**12.** The third cause of action asserted that DBTCA's transfer of the funds back to NBAD violated an injunction that had been issued in Sabena's ancillary bankruptcy proceeding. Supreme Court dismissed the third cause of action, sua sponte, on the ground that a state court does not have jurisdiction to determine whether a bankruptcy court injunction has been violated. Although Sabena originally filed a notice of cross appeal from the order insofar as it dismissed the third cause of action, Sabena states in its respondent's brief that it has withdrawn the cross appeal.

Note to UCC article 4-A, reprinted in McKinney's Cons Laws of NY, Book 62½, UCC art 4-A at 220 [2013 ed]). Accordingly, the drafters of article 4-A "undertook to develop a body of unique principles of law that would address every aspect of the electronic funds transfer process and define the rights and liabilities of all parties involved in such transfers" (*Banque Worms*, 77 NY2d at 371, citing Prefatory Note) to further the policy goals of "[n]ational uniformity in the treatment of electronic funds transfers . . . , speed, efficiency, certainty . . . , and finality" (*Banque Worms*, 77 NY2d at 372). In this regard, the drafters of article 4-A explained:

> "A deliberate decision was . . . made [in drafting the article] to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.
>
> "Funds transfers involve competing interests— those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and *are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article*. Consequently, resort to principles of law or equity outside of Article [4-A] is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article" (UCC 4-A-102, Comment [emphasis added]).

Consistent with the intention to make article 4-A "the exclusive means of determining the rights, duties and li-

abilities" arising from an EFT, the statute expressly limits the obligations and potential liability of a "receiving bank"—i.e., a bank, like DBTCA in this case, to which a payment order is addressed (UCC 4-A-103 [1] [d])—with respect to the payment order. UCC 4-A-212 provides:

> "If a receiving bank fails to accept a payment order that it is obliged by express agreement to accept, the bank is liable for breach of the agreement to the extent provided in the agreement or in this Article, *but does not otherwise have any duty to accept a payment order or, before acceptance, to take any action, or refrain from taking action, with respect to the order except as provided in this Article or by express agreement.* Liability based on acceptance arises only when acceptance occurs as stated in Section 4-A-209 [i.e., in the case of a receiving bank other than the beneficiary's bank, when the bank executes the order (UCC 4-A-209 [1]) by issuing its own payment order to the next bank in the chain (UCC 4-A-301 [1])], and liability is limited to that provided in this Article. A receiving bank is not the agent of the sender or beneficiary of the payment order it accepts, or of any other party to the funds transfer, and *the bank owes no duty to any party to the funds transfer except as provided in this Article or by express agreement*" (emphasis added).[13]

Thus, even if Executive Order 13067 had never intervened, DBTCA, as intermediary bank, would not have had any obligation under article 4-A to accept the payment order it received from NBAD, the originator's bank, by sending a further pay-

---

**13.** *See also* UCC 4-A-209, Comment 3 ("A receiving bank has no duty to accept a payment order unless the bank makes an agreement . . . to accept it, or acceptance is required by a funds transfer system rule"); UCC 4-A-211, Comment 6 ("Acceptance by the receiving bank of a payment order issued by the sender is comparable to acceptance of an offer under the law of contracts"); *Banco De La Provincia De Buenos Aires v BayBank Boston N.A.* (985 F Supp 364, 368-369 [SD NY 1997] ["Liability of receiving banks arises only if the receiving bank accepts a payment order"]). Since the complaint alleges that DBTCA, in compliance with the federal blocking order, did not execute the payment order it received from NBAD, and an intermediary bank accepts a payment order by executing it (UCC 4-A-209 [1]), DBTCA, according to the complaint itself, did not accept the payment order.

ment order to Generale Bank, the beneficiary's bank.[14] Indeed, even if DBTCA had sent a further payment order to the beneficiary's bank (which it never did), DBTCA would have incurred an obligation to the beneficiary's bank only, not to the beneficiary—Sabena—itself. From the above-quoted statutory definition of a "funds transfer" as comprising a "series of transactions" (UCC 4-A-104 [1]), it is evident that "[a]rticle 4-A treats a funds transfer as a series of individual transactions, each of which involve[s] two parties dealing directly with each other," or, stated otherwise, "as a series of transactions each of which involves only the parties to the individual payment order" (*Grain Traders, Inc. v Citibank, N.A.*, 960 F Supp 784, 789 [SD NY 1997], *affd* 160 F3d 97 [2d Cir 1998]; *see also* PEB Commentary No. 16 at 1 ["A funds transfer is a series of payment orders that create contractual obligations only as to the sender and receiver of each payment order"]; *id.* at 2 ["the issuance and acceptance of payment orders create rights and obligations only as between the sender of the payment order and its receiving bank"]).

Here, the failed EFT from Sudan Airways to Sabena comprised two payment orders, the first from Sudan Airways to NBAD, the second from NBAD to DBTCA. Sabena, the intended beneficiary of the EFT, was not a party to the payment order addressed to DBTCA, the intermediary bank, and Sabena therefore has no rights under that payment order (*see* PEB Commentary No. 16 at 2 ["The intermediary bank has no contractual obligation to the originator or to the beneficiary, and neither the originator nor the beneficiary has any contractual obligation to or rights flowing from the intermediary bank"]; *id.* at 3 [in the event an EFT is not completed, "(t)he beneficiary . . . has no claim to any payment from the intermediary bank"]).

That a beneficiary has no claim against an intermediary bank based on an aborted EFT is illustrated by *United States v BCCI Holdings (Luxembourg), S.A.* (977 F Supp 12 [D DC 1997], *affd* 159 F3d 637 [DC Cir 1998] [*BCCI*]), a case decided, in pertinent part, under New York law. In *BCCI*, the subject EFT was halted when the assets of the New York intermediary bank (BCCI[O]) were frozen by bank regulators and then made subject to an order of forfeiture in a federal criminal proceed-

---

**14.** Sabena does not allege that any express agreement or funds transfer system rule obligated DBTCA to accept the payment order it received from NBAD.

ing against the bank. The intended beneficiary of the EFT, the State Trading Organization of the Republic of the Maldives (STO), filed an "L-claim" to the funds pursuant to 18 USC § 1963 (l) (2), which affords a third party claiming a legal interest in forfeited property a procedure by which to obtain judicial resolution of its claim (*see* 977 F Supp at 15). The federal district court granted the government's motion for summary dismissal of STO's claim, concluding, inter alia, that, under article 4-A, STO, as beneficiary of the uncompleted EFT, had no legal interest in the funds in the possession of BCCI(O), the defunct intermediary bank. On that point, the court explained:

> "When a funds transfer is not completed, the intermediary bank receiving payment is obligated to refund payment to the sender [as more fully discussed below]. . . . Unlike the debt BCCI(O) owed to the sender, it owed nothing to STO as the beneficiary since an intermediary bank has no legal obligation to the beneficiary. And, unlike the originating bank and other senders, STO simply never had title to the funds. STO, therefore, has neither a cause of action against BCCI(O) nor a claim of title to the specific funds" (977 F Supp at 18 [citations omitted]).

As the Second Circuit noted in a case holding that, under New York law, the originator of an EFT had no right of action against an intermediary bank, "sound policy reasons" support article 4-A's requirement that each party to an EFT seek redress for a failed transfer only against a party with which it is in direct privity in the chain of payment orders:

> "To allow a party to, in effect, skip over the bank with which it dealt directly, and go to the next bank in the chain would result in uncertainty as to rights and liabilities, would create a risk of multiple or inconsistent liabilities, and would require intermediary banks to investigate the financial circumstances and various legal relations of the other parties to the transfer. These are matters as to which an intermediary bank ordinarily should not have to be concerned and, if it were otherwise, would impede the use of rapid electronic funds transfers in commerce by causing delays and driving up costs" (*Grain Traders*, 160 F3d at 102).

Similarly, this Court, in rejecting an attempt by a creditor of the originator to attach an EFT, has observed that, if "[d]omes-

tic and foreign banks . . . become embroiled in controversies surrounding underlying transactions of which they have no knowledge or connection . . . the entire system of correspondent banking, in which New York banks play an important role, will be disrupted" (*Sigmoil Resources v Pan Ocean Oil Corp. [Nigeria]*, 234 AD2d 103, 104 [1st Dept 1996], *lv dismissed* 89 NY2d 1030 [1997] [internal quotation marks omitted]).

Not only did DBTCA never have any legal obligation to Sabena with respect to the subject EFT, the delay of more than five business days imposed by the federal blocking order resulted, under UCC 4-A-211 (4), in the cancellation, by operation of law, of the payment order DBTCA had received from the originator's bank (*see Impulse Trading, Inc. v Norwest Bank Minn., N.A.*, 907 F Supp 1284, 1288 [D Minn 1995] [applying the Minnesota equivalent of New York UCC 4-A-211 (4)]).[15] The cancellation of the payment order excused the obligation of the originator's bank to pay DBTCA, the intermediary bank, for that payment order (UCC 4-A-402 [3]).[16] By the same token, the cancellation of the originator's bank's payment order obligated DBTCA, upon the lifting of the federal block, to

---

15. UCC 4-A-211 provides in pertinent part:
    "(4) An unaccepted payment order is cancelled by operation of law at the close of the fifth funds-transfer business day of the receiving bank after the execution date or payment date of the order.
    "(5) A cancelled payment order cannot be accepted."
    The policy behind article 4-A's automatic cancellation provision was explained by the drafters as follows:
    "[UCC 4-A-211 (4)] deals with stale payment orders. Payment orders normally are executed on the execution date or the day after. . . . If a payment order is not accepted on its execution or payment date or shortly thereafter, it is probable that there was some problem with the terms of the order or the sender did not have sufficient funds or credit to cover the amount of the order. Delayed acceptance of such an order is normally not contemplated, but the order may not have been cancelled by the sender. [UCC 4-A-211 (4)] provides for cancellation by operation of law to prevent an unexpected delayed acceptance" (UCC 4-A-211, Comment 7).

16. UCC 4-A-402 (3) provides in pertinent part:
    "With respect to a payment order issued to a receiving bank other than the beneficiary's bank, acceptance of the order by the receiving bank obliges the sender to pay the bank the amount of the sender's order. . . . The obligation of that sender to pay its payment order is excused if the funds transfer is not completed by acceptance by the beneficiary's bank of a payment order

refund to the originator's bank any payment the latter had already made for that payment order, pursuant to the "money-back guarantee" provision of UCC 4-A-402 (4) (*see* UCC 4-A-402, Comment 2). Specifically, in language that leaves little room for interpretation, UCC 4-A-402 (4) provides: "If the sender of a payment order pays the order and was not obligated to pay all or part of the amount paid, *the bank receiving payment is obliged to refund payment to the extent the sender was not obliged to pay*" (emphasis added; *see* PEB Commentary No. 16 at 3 [in the event an EFT is not completed, "the only party with a claim against the intermediary bank is the sender to that bank, which is typically the originator's bank" and "(t)he intermediary bank owes its refund obligation to its sender, the originator's bank"]).

Consistent with the foregoing provisions establishing that the intermediary bank has no obligation to the originator or the beneficiary, other provisions of article 4-A make it plain that an intermediary bank is not properly subject to creditor process (such as attachment) or judicial restraint with respect to an EFT because the funds belong to neither the originator nor the beneficiary while in transit. Specifically, UCC 4-A-502 (4) provides that creditor process with respect to an EFT "may be served only on the beneficiary's bank with respect to the debt owed by that bank to the beneficiary," but that "[a]ny other bank served with the creditor process is not obliged to act with respect to the process." Similarly, UCC 4-A-503 provides that "a court may restrain (i) a person from issuing a payment order to initiate a funds transfer, (ii) an originator's bank from executing the payment order of the originator, or (iii) the beneficiary's bank from releasing funds to the beneficiary or the beneficiary from withdrawing funds," but "may not otherwise restrain a person from issuing a payment order, paying or receiving payment of a payment order, or otherwise acting with respect to a funds transfer."

The drafters of article 4-A, in the official comments, explain that the rationale behind these limitations is that neither the originator nor the beneficiary holds title to the EFT when it is in the possession of a bank with which that party is not in privity. Thus, with regard to the beneficiary, the drafters write that, "until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the

instructing payment to the beneficiary of that sender's payment order."

beneficiary, *the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach*" (UCC 4-A-502 [4], Comment 4 [emphasis added]; *see also* PEB Commentary No. 16 at 1 [the contractual obligations between the sender and receiver of each payment order in an EFT "are not the property of either the originator or the beneficiary"]). Given that the funds in transit are not the property of either originator or beneficiary, UCC 4-A-503 "is designed to prevent interruption of a funds transfer after it has been set in motion" and, "[i]n particular, intermediary banks are protected" by the statute (UCC 4-A-503, Comment).

In view of the foregoing, it is not surprising that a substantial body of recent case law recognizes, as this Court did nearly 20 years ago, the principle that "[n]either the originator who initiates payment nor the beneficiary who receives it holds title to the funds in the account at the correspondent [i.e., intermediary] bank" (*Sigmoil Resources*, 234 AD2d at 104 [rejecting an attempt to attach an EFT by a creditor of the originator]; *see also BCCI*, 977 F Supp at 18 [the beneficiary "simply never had title to the funds" of an EFT that was halted at an intermediary bank by government action]). For example, in *Jaldhi* (585 F3d 58 [2d Cir 2009]), the Second Circuit, overruling one of its own precedents, held that an EFT in the hands of a New York intermediary bank is not subject to attachment by a creditor of the beneficiary under federal maritime law because "EFTs are neither the property of the originator nor the beneficiary while briefly in the possession of an intermediary bank" (585 F3d at 71). The *Jaldhi* court looked to article 4-A of the New York UCC to determine whether the EFT was attachable property of the beneficiary under federal maritime law (585 F3d at 70).

In a subsequent case, the Second Circuit, again looking to article 4-A of the New York UCC for guidance, determined that "an EFT temporarily in the possession of an intermediary bank in New York may not be garnished under the [Federal Debt Collection Procedures Act] to satisfy judgment debts owed by the originator or intended beneficiary of that EFT" (*Export-Import Bank of the U.S. v Asia Pulp & Paper Co., Ltd.*, 609 F3d 111, 113 [2d Cir 2010]). Noting that "midstream EFTs are the property of neither the originator nor the beneficiary of the EFT under New York law" (*id.* at 115-116), the *Asia Pulp* court concluded that "an originator and intended beneficiary have no legal claim or contractual rights against an intermediary bank

in the event that a funds transfer is not completed" (*id.* at 121).

More recently, the Second Circuit has applied the principle that a midstream EFT is not the property of either the originator or the beneficiary in cases arising in the same context that gives rise to the instant dispute, namely, an EFT frozen at an intermediary bank by a federal blocking order. In *Calderon-Cardona* (770 F3d 993 [2d Cir 2014]), the question was whether the petitioners, who had obtained a judgment against the North Korean government based on its complicity in a terrorist attack, could enforce that judgment against EFTs that had been blocked at intermediary banks in New York pursuant to federal sanctions against North Korea. The petitioners relied on a statutory exception to the doctrine of foreign sovereign immunity that permits a judgment against a foreign state based on its complicity in terrorism to be enforced against "property of [the] foreign state" and "property of an agency or instrumentality of such a state" (28 USC § 1610 [g] [1]). The Second Circuit held that the judgment could be enforced against an EFT blocked pursuant to the sanctions "only where either the [foreign] state itself or an agency or instrumentality thereof . . . transmitted the EFT directly to the bank where the EFT is held pursuant to the block" (770 F3d at 1002). The court explained:

> "Because EFTs function as a chained series of debits and credits between the originator, the originator's bank, any intermediary banks, the beneficiary's bank, and the beneficiary, the only party with a claim against an intermediary bank is the sender to that bank, which is typically the originator's bank [citing *Asia Pulp* and PEB Commentary No. 16]. . . . Put another way, under the [New York] UCC's statutory scheme, the only entity with a property interest in an EFT while it is midstream is the entity immediately preceding the bank 'holding' the EFT in the transaction chain. *In the context of a blocked transaction, this means that the only entity with a property interest in the stopped EFT is the entity that passed the EFT on to the bank where it presently rests*" (*id.* at 1001-1002

[emphasis added; internal quotation marks and citations omitted]).[17]

In the present case, to reiterate, based on the allegations of Sabena's complaint, NBAD, the originator's bank—rather than Sabena, the intended beneficiary of the failed EFT—was plainly "the entity that passed the EFT on to [DBTCA,] the bank where it . . . rest[ed]" (*Calderon-Cardona*, 770 F3d at 1002) until the federal block was released. It follows that NBAD was "the only entity with a property interest in the stopped EFT [at DBTCA]" (*id.* at 1002) and that, upon the release of the block, DBTCA properly refunded NBAD's payment for the EFT pursuant to UCC 4-A-402 (4), given that the EFT had long since been cancelled by operation of law under UCC 4-A-211 (4). It also follows that, pursuant to UCC 4-A-212, Sabena has no claim against DBTCA with respect to this transaction. DBTCA "owed nothing to [Sabena] as the beneficiary since an intermediary bank has no legal obligation to the beneficiary" (*BCCI*, 977 F Supp at 18) and, perforce, Sabena "never had title to the funds" (*id.*; *see also* PEB Commentary No. 16 at 2 ["credits in an intermediary bank are credits in favor of the originator's bank, *and are not property of either the originator or the beneficiary*"]).[18]

---

**17.** The Second Circuit held to similar effect in *Hausler v JP Morgan Chase Bank, N.A.* (770 F3d 207 [2d Cir 2014], *cert denied* 577 US —, 136 S Ct 893 [2016]), which ruled that EFTs blocked pursuant to sanctions against Cuba were not available to satisfy judgments against Cuba under the exception to foreign sovereign immunity of the Terrorism Risk Insurance Act of 2002 (codified at 28 USC § 1610 Note, as added by Pub L 107-297, tit II, § 201, 116 US Stat 2322). The *Hausler* court, looking to article 4-A of the New York UCC to determine property rights in the EFTs, reasoned that, because "no Cuban entity transmitted any of the blocked EFTs . . . directly to the blocking bank," it therefore followed that "neither Cuba nor its agents or instrumentalities have any property interest in the EFTS that are blocked at the garnishee banks" (*id.* at 212).

**18.** We note that the foregoing principles were recognized in our most recent decision addressing an issue of ownership of midstream EFTs, *Palestine Monetary Auth. v Strachman* (62 AD3d 213 [1st Dept 2009] [*Strachman*], *supra*). *Strachman* concerned an attempt by judgment creditors of the Palestinian Authority (PA) to enforce the judgment against frozen midstream EFTs, of which the Palestine Monetary Authority (PMA) was either the originator or a beneficiary (*id.* at 216, 225). This Court first determined that the PMA had failed to establish that the judgment against the PA could not be enforced against property of the PMA (*id.* at 222-223). Thereafter, while we reaffirmed the principle that neither the originator nor the beneficiary holds title to a midstream EFT (*id.* at 228-229), we held, based on evidence in the *Strachman* record, that discovery was required to determine whether the originator's bank with respect to the EFTs, the Palestine International

Sabena argues that—notwithstanding the express provisions of article 4-A discussed above, the foregoing case law applying those provisions, and the above-quoted official commentary to the article—Supreme Court correctly denied DBTCA's motion to dismiss the complaint in reliance on three cases. In each of these cases, following the release of an attachment or governmental block of an EFT at an intermediary bank, the intermediary bank was directed to complete the EFT by sending a payment order to the beneficiary's bank. Two of these cases are decisions by this Court that cannot fairly be read to support Sabena's position because no litigant on either of those appeals brought to this Court's attention that directing an intermediary bank to complete an EFT that had been blocked for more than five business days is inconsistent with multiple express provisions of article 4-A.[19] The third case is an officially unreported summary order of the Second Circuit, which has no precedential effect in that court (see Local Rules of 2d Cir rule 32.1.1 [a]). To the extent that federal court decision supports Sabena's position, we respectfully decline to follow it.

The decision on which Sabena places primary reliance, as did Supreme Court, is *Bank of N.Y. v Norilsk Nickel* (14 AD3d 140 [1st Dept 2004], *appeal dismissed* 4 NY3d 843 [2005]), a case concerning three EFTs that had been blocked at a New York intermediary bank for about a decade due to sanctions against Serbia. When the block was lifted, the intermediary bank commenced an interpleader proceeding against Norilsk, the intended beneficiary of the EFTs, and Monter, a creditor of the originator that had purported to attach the funds. The case came before this Court upon Norilsk's appeal from an order

---

Bank (PIB), was "merely an agent for collection for its depositors" (*id.* at 230). We explained that, if the PIB, by reason of the PMA's control over it (as some record evidence suggested was the case [*see id.* at 230]), had been acting as the PMA's agent or alter ego in sending the payment order to the intermediary bank in New York, it would mean that "title [to the EFTs] did not pass [from the originator, the PMA] to the PIB [as the originator's bank]" (*id.* at 230) upon the PIB's sending of that payment order. Here, the question is not whether title to the EFT passed from the originator to the originator's bank (it did), but whether the beneficiary had any claim to the funds in the possession of an intermediary bank.

**19.** Specifically, as has been more fully discussed above, such a direction is inconsistent, at a minimum, with the following provisions of article 4-A: UCC 4-A-211 (4) (an unaccepted payment order is cancelled by operation of law after five business days); UCC 4-A-211 (5) (a cancelled payment order cannot be accepted); UCC 4-A-212 ("A receiving bank . . . owes no duty to any party to the funds transfer except as provided in this Article or by express agreement"); UCC 4-A-402 (4) (the money-back guarantee).

denying its motion, and Monter's cross motion, for summary judgment. Only Norilsk and Monter submitted briefs on the appeal. The intermediary bank, which had been discharged from liability and awarded attorney's fees by Supreme Court, did not appear on the appeal, and neither the originator nor the originator's bank was a party to the proceeding.

The primary focus of the *Norilsk Nickel* decision is its discussion of the principal argument made by Monter, the originator's creditor, which was that the OFAC regulations implementing the sanctions regime somehow preempted the UCC with respect to the determination of the ownership of the credits at the intermediary bank (14 AD3d at 145-147). We rejected this argument, determined that the UCC governed ownership of the EFTs, and recognized that, under the UCC, the originator's creditor could not attach the EFTs at the intermediary bank because the originator ceased to hold title to them once the originator's bank had sent its payment orders (*id.*). Having concluded that Monter's attachment had been improper, we stated, without further discussion of the point, that, in view of the lifting of the federal block, "the funds [should] be transferred to the rightful owner, Norilsk [the beneficiary]" (*id.* at 147), and directed that the funds be released to Norilsk (*id.* at 150).

In our view, *Norilsk Nickel*'s determination to release the previously blocked EFTs to the beneficiary cannot be viewed as precedent for permitting a beneficiary to sue an intermediary bank for refunding a previously blocked EFT to the originator's bank. Apart from the fact that the beneficiary in *Norilsk Nickel* was not asserting a claim against the intermediary bank (as Sabena does here), the party to *Norilsk Nickel* that had an interest in making the argument that DBTCA makes in this case—the intermediary bank (the Bank of New York)—chose, for reasons unknown, to disclaim any interest in the disposition of the funds and to leave the matter to be litigated between the beneficiary and the originator's creditor. Because the intermediary bank in *Norilsk Nickel* did not make DBTCA's present argument and the originator's bank was not a party to the proceeding, this Court—based on briefs that did not even cite article 4-A's provisions for cancellation by operation of law of stale payment orders (UCC 4-A-211 [4], [5]), for a receiving bank's liability and duty with respect to an unaccepted payment order (UCC 4-A-212), or for a receiving bank's money-back guarantee to its sender (UCC 4-A-402 [4])—simply

decided, based on the arguments actually presented to it, which of the only two claimants before it (the beneficiary and the originator's creditor) had a stronger claim to the money.[20] We do not believe that the doctrine of stare decisis calls for us to follow *Norilsk Nickel* on a point on which the litigants in that case neither brought the applicable law to this Court's attention nor advanced the argument now being made by DBTCA.

For similar reasons, the other decision of this Court on which Sabena relies, *European Am. Bank v Bank of Nova Scotia* (12 AD3d 189 [1st Dept 2004] [*EAB*]), does not genuinely support Sabena's position. *EAB* was an appeal arising from a turnover proceeding in which petitioner EAB, a judgment creditor of the beneficiary of an EFT, sought to execute the judgment against the EFT while it was in the possession of a New York intermediary bank, respondent Bank of Nova Scotia. In denying the petition and vacating the marshal's levy, Supreme Court directed that the EFT be released to the beneficiary's bank, Scotiabank (Cayman Islands) Ltd. Upon EAB's appeal, this Court affirmed. Although *EAB* notes that, under UCC 4-A-502 (4), an EFT is not subject to creditor process while in the possession of an intermediary bank (*see* 12 AD3d at 190), the decision does not discuss Supreme Court's direction that the funds be released to the beneficiary's bank beyond referring to it in the decretal paragraph. As in *Norilsk Nickel,* an examination of the briefs on which *EAB* was decided shows that neither of the only two parties that appeared—EAB, the judgment creditor of the beneficiary, and Bank of Nova Scotia, the intermediary bank—raised the arguments made on the instant appeal by DBTCA.

In sum, neither *Norilsk Nickel* nor *EAB* may fairly be read to reject the argument that an EFT that was previously blocked at an intermediary bank for more than five business days should be refunded to the intermediary bank's sender—the conclusion that, in our view, article 4-A plainly requires—because that argument simply was not made to the panels that decided those appeals. Thus, the third decision on which Sabena relies, *Goodearth Mar. Ltd. v Calder Seacarrier Corp.* (387 Fed Appx 19 [2d Cir 2010]), incorrectly relied on *Norilsk Nickel* and *EAB* as support for its express rejection of that

---

**20.** While UCC 4-A-402 (5) provides that, under certain circumstances, a sender of a payment order may become subrogated to its receiving bank's right to a refund from the next bank in the chain, the originator's creditor in *Norilsk Nickel* made no argument that the originator was such a subrogee.

argument and its conclusion that, under New York law, an improper attachment of an EFT at an intermediary bank "only interrupted the transfer, and did not cancel it" (387 Fed Appx at 21) and the "frozen funds may rightfully go to the beneficiary" upon the release of the attachment (*id.* at 22). In this regard, we again note that the Second Circuit decided *Goodearth* as a summary order and, as such, *Goodearth* "do[es] not have precedential effect" in the Second Circuit itself (Local Rules of 2d Cir rule 32.1.1 [a]).[21]

Once it is recognized that the EFTs were awarded to the beneficiaries in *Norilsk Nickel* and *EAB* based on the way the parties to those appeals had framed the issue for this Court, Sabena's theory—which is that otherwise applicable sections of article 4-A providing for cancellation of a stalled payment order by operation of law (UCC 4-A-211 [4]), for the limitation of a receiving bank's liability (UCC 4-A-212), and for a receiving bank's money-back guarantee to its sender (UCC 4-A-402 [4]) do not apply where the EFT has been blocked for an extended period by federal regulatory authority—collapses for lack of support. Nothing in article 4-A, or the official commentary thereto, supports Sabena's contention that such an exception exists. Further, while Sabena correctly notes that the purpose of the money-back guarantee provision is, in part, to protect originators from loss due to errors by banks (*see* UCC 4-A-402, Comment 2), the entire structure of article 4-A is intended to limit the risks faced by intermediary banks in the funds transfer process (*see Grain Traders*, 160 F3d at 102; *Sigmoil Resources*, 234 AD2d at 104; UCC 4-A-102, Comment).

Sabena suggests in its brief that whether the originator of an EFT is "innocent" should affect the obligations of an intermediary bank. This suggestion flies in the face of article 4-A's concern to keep the funds transfer system running smoothly by setting forth "precise and detailed rules" for banks and their customers to follow (UCC 4-A-102, Comment) and by limiting each party's risks to those arising from the other par-

---

**21.** In *Goodearth*, the competing claimants to the subject EFT, upon its release from the improper attachment, were the originator and intended beneficiary, the only parties that appeared on the appeal. The originator's bank was not a party to the litigation. The *Goodearth* court correctly observed that the party entitled to a refund under the money-back guarantee provision of UCC 4-A-402 (4) was the originator's bank, not the originator itself (387 Fed Appx at 21-22). From the originator's lack of entitlement to the funds, however, it does not necessarily follow that the beneficiary was entitled to them.

ties with which it has chosen to deal directly. In this case, DBTCA, as an intermediary bank in privity with neither Sabena nor Sudan Airways, was entitled, when the funds were unblocked, to look to the express provisions of article 4-A to determine its obligations, without worrying about whether the character of the originator might vary those obligations and, if a court later disagreed with DBTCA's assessment, result in the bank's incurring double liability. It is Sabena, not DBTCA, that chose to do business with Sudan Airways, and it is Sabena that should bear the risk of loss from that choice.[22]

The foregoing, we believe, establishes that Sabena has not stated a legal cause of action against DBTCA under article 4-A of the UCC. Neither has Sabena stated any viable cause of action against DBTCA under the license OFAC issued, releasing the previous federal block on the funds. As previously noted, the license was issued pursuant to subpart E of 31 CFR part 538, and simply provided that DBTCA was "authorized to release these funds," without specifying to which party the funds should be released. Nonetheless, Sabena claims that DBTCA violated the license by remitting the funds back to NBAD, pointing to a regulation (31 CFR 538.403 [b]) that Sabena construes (without citing supporting authority) to mean that a license unblocking property does not permit the property to be transferred toward Sudan (as opposed to away from it) unless the license specifically so provides.

Even if Sabena's construction of 31 CFR 538.403 might be correct, we find that Sabena's attempt to state a cause of action under the license fails by reason of 31 CFR 538.501 (c), which provides in pertinent part: "Unless [a] regulation, ruling, instruction, or license [issued under part 538 to authorize an otherwise prohibited transaction] otherwise specifies, *such*

---

**22.** That the choice to deal with Sudan Airways was Sabena's, not DBTCA's, would also defeat Sabena's argument that the "equities" of this case somehow give Sabena a claim against DBTCA, even if it were possible for an equitable argument to prevail over the express terms of article 4-A, which it is not (*see* UCC 4-A-102, Comment ["resort to principles of law or equity outside of Article (4-A) is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article"]). The failure of the EFT due to the federal blocking order did not extinguish Sabena's legal claim against Sudan Airways, because the contractual obligation that an EFT is intended to fulfill is discharged only upon the beneficiary's bank's acceptance of the final payment order in the chain (*see* UCC 4-A-406), which never happened here. Assuming that, as Sabena argues, it had no practical alternative means for obtaining payment from Sudan Airways, this was simply part of the risk that Sabena assumed in choosing to do business with that entity.

*an authorization does not create any right, duty, obligation, claim, or interest in, or with respect to, any property which would not otherwise exist under ordinary principles of law"* (emphasis added). Thus, even if the license did not permit DBTCA to send the funds back to Sudan Airways' bank—which would be a matter to be addressed by the federal authorities— the license did not confer upon Sabena any rights or claims with respect to the funds that Sabena would not otherwise have had "under ordinary principles of law"—here, article 4-A of the New York UCC (*cf. General Cable Ceat, S.A. v Futura Trading, Inc.*, 1983 WL 1156, *3, 1983 US Dist LEXIS 19956, *8 [SD NY, Jan. 17, 1983, No. 82-Civ-1087 (RLC)] [in dismissing claims against a bank for refusing to make a payment permitted by a license as an exception to sanctions against Iran, the court relied on 31 CFR 535.502 (c), containing language identical to the above-quoted language from 31 CFR 538.501 (c)]). Stated otherwise, the OFAC license, whatever its proper construction, did not turn Sabena into the owner of a bank credit not otherwise owed to it under New York law.[23]

Finally, because article 4-A of the UCC governs this matter exclusively and, assuming the truth of the allegations of the complaint, it is plain, as previously discussed, that DBTCA acted properly with respect to the subject EFT, in which Sabena had no ownership or possessory interest, Sabena's cause of action for conversion, which seeks to impose liability inconsistent with the rights and liabilities expressly created by article 4-A, is legally insufficient (*see Grain Traders*, 160 F3d at 103; *Peters Griffin Woodward, Inc. v WCSC, Inc.*, 88 AD2d 883, 884 [1st Dept 1982]).

Since the foregoing establishes that Sabena has not stated a legally sufficient cause of action based on the refunding of the payment order to NBAD, we need not consider whether DB, DBTCA's codefendant and indirect owner, would be entitled to be dismissed from the action even if the complaint were being sustained as against DBTCA. Nor need we consider defendants' remaining arguments.

---

**23.** Sabena misplaces reliance on *AY Bank Ltd. v JPMorgan Chase & Co.* (2006 NY Slip Op 30012[U] [Sup Ct, NY County 2006]), in which an account-holder was permitted to assert a cause of action against its bank based on the bank's failure to place blocked funds in an interest-bearing account, as provided by OFAC regulations. The claim in *AY Bank* was not based on a license, there was no question that the plaintiff owned the funds in question, and there was privity between the plaintiff account-holder and the defendant bank.

Accordingly, the order of Supreme Court, New York County (Saliann Scarpulla, J.), entered July 7, 2014, which, to the extent appealed from as limited by the briefs, denied defendants' motion to dismiss the complaint, should be reversed, on the law, with costs, the motion granted, and the complaint dismissed. The Clerk is directed to enter judgment accordingly.

TOM, J.P., SWEENY and SAXE, JJ., concur.

Order, Supreme Court, New York County, entered July 7, 2014, reversed, on the law, with costs, the motion granted, and the complaint dismissed. The Clerk is directed to enter judgment accordingly.